# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MAGALY CAMACHO <u>et al.</u> | ) | |
| Plaintiffs, | ) | Civil Action No. 02-10428-DPW |
| v. | ) | |
| | ) | |
| WILLIAM FRANCIS GALVIN, | ) | |
| in his official capacity as Secretary of the | ) | |
| Commonwealth of Massachusetts, | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| BLACK POLITICAL TASK FORCE <u>et al.</u> | ) | Civil Action No. 02-11190-DPW |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| WILLIAM FRANCIS GALVIN, | ) | |
| in his official capacity as Secretary of the | ) | |
| Commonwealth of Massachusetts, | ) | |
| Defendant. | ) | |


## AFFIDAVIT OF RICHARD L. ENGSTROM, Ph.D.

I, Richard L. Engstrom, declare and say as the follows:

1.     My name is Richard L. Engstrom and I am a resident of New Orleans, Louisiana. I am a Research Professor of Political Science and Coordinator of Graduate Studies in the Department of Political Science at the University of New Orleans (UNO), and the Endowed Professor of Africana Studies at UNO. I have served two terms as the Chairperson of the Representation and Electoral Systems Section of the American Political Science Association (1993-1995, 1995-1997) and continue to serve as a member of the Executive Council for that section. A copy of my curriculum vitae is attached to this declaration as Appendix E.

2.     I have done extensive research into the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect

representatives of their choice. The results of my research have been published in the *American Political Science Review*, *Journal of Politics*, *Western Political Quarterly*, *Legislative Studies Quarterly*, *Social Science Quarterly*, *Journal of Law and Politics*, *Electoral Studies*, and other journals and books. Three articles authored or co-authored by me were cited with approval in Thornburg v. Gingles, 478 U.S. 30, at 46 n.11, 49 n.15, 53 n.20, 55, and 71 (1986), the Supreme Court decision interpreting amended section 2 of the Voting Rights Act. I am a co-author, with Mark A. Rush, of *Fair and Effective Representation? Debating Electoral Reform and Minority Rights* (Lanham, MD: Rowman and Littlefield Publishers, Inc. 2001).

3.      I have also testified as an expert witness in a number of voting rights cases in federal courts across the United States. Since 1999 I have testified at trial and/or been deposed in the following cases: Maxwell v. Foster (W.D. La. 1999), Sanders v. Dooly County (M.D. Ga. 2000), Ruiz v. City of Santa Maria (C.D. Ca. 2000), Johnson v. Hamrick (N.D. Ga. 2001), Del Rio v. Perry (200th Dist. Ct. Tx. 2001), Balderas v. State of Texas (E.D. Tx 2001), Johnson v. Bush (S.D. Flda 2001), Jepsen v. Vigil-Giron (1st Judicial District Court, County of Santa Fe, NM 2001, 2002), Arizona Minority Coalition for Fair Redistricting v. Arizona Independent Redistricting Commission (Superior Court, County of Maricopa, AZ, 2002), Curry v. Glendening, Court of Appeals of Maryland (2002), Levy v. Miami-Dade Co (S.D. Flda. 2002), Dillard v. Baldwin Co. (M.D. Ala. 2002), and Prejean v. Foster (M.D. La. 2002), Louisiana House of Representatives v. Ashcroft (D.C. DC 2002), and United States v. Alamosa County (D. Co. 2003).

4.      Boston, MA is a city that is 20.5 percent African American in voting age population,[1] and 12.1 percent Latino, according to the 2000 census. Attorneys for the plaintiffs

---

[1]  The definition of African Americans employed in this report are those who identify themselves in the census as only African American or Black in race and not Hispanic.

have asked me to analyze the extent to which the candidate preferences of African American and non-African American voters in Boston have differed in recent elections in which they have been presented with a choice between or among African American and non-African American candidates or Latino and non-Latino candidates. I also was asked to conduct a similar analysis with respect to the candidate preferences of Latino voters, but that analysis encountered data problems discussed in footnotes 2 and 8 below. These elections are the 2001, 1997, and 1995 at-large elections for the city council, the 2002 citywide election for District Attorney, and the 1998 Democratic primary for the Suffolk 9th District in the state House of Representatives.[2]  In addition, I have been asked to compare the vote within the 11th and 12th Suffolk districts adopted by the state and the illustrative 11th and 12th districts presented by the plaintiffs.

5.     I am being compensated at a rate of $200 an hour for my work in this case.

6.     The data utilized in the analyses of the candidate preferences of African American and non-African American voters consist of the number of votes in the precincts within the city cast for each of the various candidates, according to official election returns, and the total number of people of voting age, as well as the number that is African American, in each precinct according to the 2000 census.[3]

---

[2]  One other state legislative election, the 2002 Democratic primary for the 15th Suffolk district, has been analyzed. This contest involved two Latino candidates, out of six, that received a combined 44.6 percent of the votes. An initial analysis of this election relying on Latino voting age population figures produced negative turnout estimates for Latinos. Estimates of candidate preferences through these data for this election would not be valid. For problems with estimating Latino voting behavior through precinct data in Boston, see footnote 8 in this report. I was also, after I prepared my reports in this case, asked to analyze the voting preferences for Augie Grace, an African American candidate for Secretary of State in 1994, in light of the fact that defendant's expert Harold Stanley had, unlike my analysis, gone back more than three election cycles. That analysis was provided to defendant at my deposition and is attached as Table 8.

[3]  Analyses based on interpolated estimates for the total and African American voting age population in each precinct, relying on the 1990 and 2000 censuses, will also be reported along with those based on the 2000 census figures for the elections in 1995 and 1997. The results of these analyses are reported in Appendices A through D attached to this report. The differences between these analyses and those using the 2000 figures are not consequential.

7.   In assessing the extent to which the candidate preferences of the African American voters differed from those of the non-African American voters in these elections I have derived estimates of group support for candidates through three different analytic procedures. These include the two methods approved for this purpose by the United States Supreme Court in <u>Thornburg</u> v. <u>Gingles</u> [478 U.S. 30, at 52-53 (1986)], which are ecological regression analysis and homogeneous precinct (or extreme case) analysis. Homogeneous precinct analyses simply report the percentage of the votes a candidate or set of candidates received within the precincts in which over 90 percent of the voting age population was not African American and within those in which over 90 percent was African American. Regression analyses provide estimates of the support for the various candidates among both African American and non-African American voters based on the votes cast in all of the precincts in an election.[4] The third methodology I employ is called Ecological Inference (or EI). This is an estimation procedure that also takes into account all of the precincts in which votes are cast that was developed subsequent to <u>Thornburg</u> v. <u>Gingles</u> by Gary King.[5]

## RACIALLY POLARIZED VOTING

8.   The candidate preferences of Boston voters in the elections in which they have been presented with a choice between or among African American and non-African American candidates has been consistently divided along group lines. African American voters

---

[4]   Correlation coefficients reflecting how consistently the vote for a candidate varies with the relative presence of African Americans in the precincts are reported along with the results of the regression analyses. The correlation coefficient can achieve values ranging from 1.0 to -1.0. A value of 1.0 indicates that as the African American percentage of voting age population increases across precincts, there is a perfectly consistent increase in the percentage of the votes received by a designated candidate or group of candidates. A value of-1.0 indicates a perfectly consistent decrease in the votes received. When the statistical probability of a coefficient is less than .05, that coefficient is identified as statistically significant. All of the correlation coefficients reported in the tables are statistically significant unless "ns" appears next to the value of the coefficient.

[5]   This procedure is the subject of Gary King, <u>A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data</u> (Princeton University Press, 1977)].

demonstrate, through their voting behavior, a preference for African American candidates, and in the one instance when presented with a Latino candidate, that candidate as well. This preference is not shared by non-African American voters.[6] The results of the analyses of these elections are reported in Tables 1 through 6.

City Council Election, 2001

9.    Boston at-large city council elections are for four seats on the council. Voters each have up to four votes to cast. In 2001 seven candidates competed for the four seats. One was a Latino, Felix Arroyo. All of the other candidates were whites; Michael Flaherty, Maura Hennigan, Stephen Murphy, Francis Roache, Rob Consalvo, and Phyllis Igoe. The results of the analyses of this election are reported in Table 1. Given that this is a multi-vote election, the estimates reported in the table for this election, as well as the tables for the other city council elections, are for the percentage of voters receiving ballots that voted for each particular candidate.

10.    The correlation between the racial composition of the precincts (measured as the African American percentage of the voting age population, or VAP) and the vote for Mr. Arroyo is a statistically significant .582. Both the ecological inference (EI) and regression analysis identify Mr. Arroyo as the candidate receiving the most votes from the African Americans receiving ballots for this election. The estimate of his support among the African Americans, based on EI, is 57.0 percent, while the estimate based on regression is 61.0 percent. (There are no homogenous African American precincts in Boston.)

---

[6]  Non-Latino whites constitute 69.7 percent of the non-African Americans of voting age.  Given that Latinos constitute over half of the remaining non-African Americans, and Latino turnout is low, whites no doubt constitute a much higher percentage of the non-African American voters.  See footnote 8.

11.     All three estimation procedures indicate that Mr. Arroyo finished sixth among the seven candidates among non-African American voters. His estimated support among these voters is 24.2 percent based on EI, 23.1 percent based on regression, and 22.0 percent based on the homogeneous precinct analysis.

## City Council Election, 1997

12.     Eight candidates sought the four at-large seats in 1997. (There was no minority candidate in the 1999 election.) One candidate, Frank Jones, was an African American. The other seven were white; Mr. Murphy and Mr. Roache again, along with Peggy Davis-Mullin, Suzanne Ianella, Paul Gannon, Pam Smith, and Albert O'Neil. The results of the analyses of this election are reported in Table 2.

13.     The correlation between the racial composition of the precincts and the vote for Mr. Jones is a statistically significant .617. Both the ecological inference (EI) and regression analysis estimates place Mr. Jones far ahead of all the other candidates in the African American vote. He receives a vote from an estimated 80.1 percent of the African Americans receiving ballots in the EI analysis, and 86.6 percent in the regression analysis. The next highest candidate was Mr. Roache, with an estimate of 33.8 percent in the EI analysis and 33.7 percent in the regression analysis.

14.     All three estimation procedures place Mr. Jones seventh among the eight candidates in the votes cast by non-African Americans in this election. He received a vote from an estimated 28.0 percent of the non-African Americans according to EI, 26.8 percent according to regression, and 28.5 percent based on homogeneous precincts.

## City Council Election, 1995

15. Eight candidates also competed for the four seats in 1995. Mr. Jones was again a candidate, competing with seven white candidates. The white candidates were Ms. Davis-Mullins, Mr. Murphy, Mr. Gannon, Mr. Roache, and Mr. O'Neil again, along with Richard Iannella and Michael Flaherty. The results of the analyses of this election are reported in Table 3.

16. The correlation between the racial composition of the precincts and the vote for Mr. Jones in this election is a statistically significant .638. Both the ecological inference (EI) and regression analysis estimate place Mr. Jones substantially ahead of all the other candidates in the African American vote. He receives a vote from an estimated 75.1 percent of the African Americans receiving ballots in the EI analysis, and 83.1 percent in the regression analysis. The next highest candidate was Mr. Iannella, with an estimated 42.9 percent in the EI analysis and 44.6 in the regression analysis. Mr. Jones finished last in the non-African American vote according to all three estimation procedures. His support among non-African Americans is estimated to have been 22.3 percent by EI, 20.7 by regression, and 22.5 through homogeneous precincts.[7]

Multivariate Analyses of City Council Elections

17. Latinos constitute 12.1 percent of the voting age population of Boston, according to the 2000 census. As a check on whether the estimates of African American cohesion identified above could be influenced by the Latino presence in precincts, I have performed multivariate regression analyses of the elections analyzed above that include the Latino voting age population as well as that for African Americans.[8] (King's EI procedure is not designed to perform this type

---

[7] The analyses reported above have also been performed for the 1997 and 1995 elections with voting age population figures that have been interpolated, based on an assumption of even growth throughout the decade between the 1990 and 2000 censuses. The results of these analyses, reported in Appendices A and B, do not differ from those reported in Tables 2 and 3 above in any consequential way.

[8] The estimates of Latino preferences in these elections must be viewed with considerable skepticism. African American VAP is used in these analyses, so therefore Latino VAP is used as well. Voter turnout by Spanish

of multivariate analysis.) The estimates of African American candidate preferences do not change in any consequential way as a result of including Latinos. These estimates, reported in Tables 4 through 6, place the African American support for Mr. Arroyo in 2001 at 52.7 percent, and for Mr. Jones in 1997 and 1995 at 88.5 percent and 81.6 percent respectively. The Latino vote for Arroyo in 2001, under this procedure, is estimated at 65.6 percent.[9]

Elections to Single Person Offices

18.     Two other elections, each involving voting in a single person office, have also been analyzed. These are the 2002 general election for Suffolk County District Attorney in 2002, and the 1998 Democratic primary for the 9th Suffolk District in the state House of Representatives. The results of the analyses of the vote for the African American candidates in these elections are reported in Table 7.

19.     The District Attorney general election in 2002 was contested by three candidates, an independent African American Eddie Jenkins, Democrat Daniel Conley, and independent William Sinnott. The correlation between the vote for Mr. Jenkins and the racial composition of

---

surnames is also available for the 1997 and 2001 elections. The turnout data reveal that the Latino presence among voters is much smaller than the Latino VAP. In 2001 Latinos constituted only 4.5 percent of the turnout, compared to 12.1 percent of the VAP. In 1997, Latinos constituted 2.4 percent of the turnout, compared to an interpolated VAP estimate of 11.4 percent. Based on regression analyses, in 2001 the Latino turnout in a precinct with a 40 percent Latino VAP would be predicted to be only 16.6 percent Latino. In 1997 the projected Latino turnout in a precinct with 40 percent Latino VAP would be only 8.2 percent using the 2000 census figures, and 9.5 using the interpolated census figures.

Among Latino voters, Latino support for candidates is no doubt higher than the figures reported in the tables. Latino VAP does not provide results in which one can have confidence because of the discrepancy between VAP and actual turnout among Latinos in Boston. At the same time, the Latino turnout data for Boston, unlike that for Chelsea (see my Expert Report in Camacho v. Galvin), do not provide an adequate basis for estimating what these levels might be given the limited variation in their presence among those turning out across precincts. In 2001, Latino turnout exceed 40 percent (41.2) in only one of Boston's 254 precincts. It exceeded 30 percent (37.0, 35.6 and 30.6) in only three others. In 1997, the highest Latino turnout in any precinct was 33.6 percent, while only one other precinct exceeded 30 percent (33.3.).

[9]  The multivariate analyses have also been replicated, using interpolated voting age figures, for Latinos as well as African Americans. The results of these analyses, reported in Appendices C and D, do not differ in consequential ways from those reported in Tables 5 and 6. The category "non-minority" in these tables refers to voters that are neither African American nor Latinos.

- 8 -

the precincts in Boston is a statistically significant .878. He was the choice of the African American voters in Boston. The EI estimate of his support among African Americans voting in this contest is 85.4 percent, while that from the regression analysis is 99.6. He was not the choice of the non-African Americans in Boston, however. Among these voters, Jenkins is estimated to have received 24.5 percent of the votes by EI, 22.1 percent by regression, and 24.8 percent through homogeneous precincts.[10]

20.    The Democratic primary for the 9th Suffolk District in 1998 was contested by long term African American incumbent Byron Rushing, and Richard Branson and Mark Walsh. The correlation between the vote for Mr. Rushing and the racial composition of the precincts is a statistically significant .819. He was the choice of the African American voters in the Boston portion of this district. The EI estimate of his support among African Americans in Boston voting in this contest is 62.0 percent, while that from the regression analysis is 85.7. He is also estimated to have received a majority of the votes cast by non-African Americans in both the EI analysis and the homogeneous precinct analysis, 54.3 and 54.0 percent, but only a plurality in the regression analysis, 42.9 percent.[11]

Conclusion

21.    When they have been offered a choice between African American and non-African American candidates, the evidence reveals that African American voters in Boston have

---

[10]    A multivariate analysis was performed on this election, with Latino voting age population added to the regression analysis. The African American vote for Jenkins is at 81.2 percent in this analysis, but the estimated turnout of Latino voters is -6.3 percent of Latino VAP.

[11]    The results of the analysis when interpolated figures are used for VAP is a statistically significant correlation of .831, and estimates of the African American vote for Rushing of 62.4 percent based on EI and 85.5 percent based on regression. The non-African American vote for Rushing is 52.9 percent based on EI and 42.2 percent, a plurality, based on regression. The Latino VAP in this district was 12.1 percent according to both the 2000 census and the interpolated census figures.  The three most Latino precincts were 37.3, 23.8, and 23.2 percent Latino in VAP based on the 2000 census, and 37.5, 23.5, and 23.2 percent based on interpolated census figures.

had a preference, demonstrated by their voting behavior, to be represented by African Americans, and on the one occasion when they were offered the choice, by a Latino. The behavior of non-African Americans voters, who are predominantly white, demonstrates that they do not share this preference. The results of the analyses reported above therefore reveal a pattern of "racially polarized voting," as that concept has been defined by the United States Supreme Court in <u>Thornburg v. Gingles</u>, at 53 n. 21.

22. African Americans in Boston are politically cohesive and prefer to be represented by people from within their group. Their opportunity to elect representatives of their choice, therefore, must include the ability to elect African Americans if it is to be considered an opportunity equal to that of non-African Americans. In a single vote, single seat election, such as a state legislative contest, non-African Americans can be expected to usually defeat the choices of African Americans unless there is a sufficient presence of African Americans in a district to overcome this difference in preferences.

## 11TH AND 12TH SUFFOLK DISTRICTS

23. The 11th Suffolk district in the state's plan has an African American VAP of 20.1 percent, along with a Latino VAP of 22.3 percent. Whites constitute a majority of the VAP, 50.7 percent. The plaintiffs provide an alternative 11th Suffolk in which African Americans constitute a plurality of the VAP, 42.4 percent, along with a Latino VAP of 21.6 percent and a white VAP of 28.6 percent. The opportunity that African Americans have to elect representatives of their choice in these districts is illustrated by the vote cast in the 2002 District Attorney election within these areas. This election is the only recent one vote election, like a state legislative election, presenting voters across these districts with a choice of voting for an African American or a non-African American.

24.     Mr. Jenkins was strongly preferred by African American voters in both versions of these districts.[12] When the votes cast in the precincts in these districts are tabulated, Jenkins loses in the state's district, receiving 41.3 percent of the vote, compared to Mr. Conley's 50.9. The result in the plaintiffs' version of the 11th however is quite different. Mr. Jenkins wins a majority of the votes, 56.8 percent.

25.     A similar difference in opportunity appears to be present in the different versions of the 12th as well. The state's district has an African American VAP of 49.1 percent. The plaintiffs' version brings that African American VAP over a majority, 56.9 percent. Mr. Jenkins is again the overwhelming choice of the African American voters in both of these districts.[13]

26.     In the Boston portion of both districts Jenkins wins a majority of the votes. He wins 51.2 percent of the vote in this part in the state's 12th, but 56.8 percent in this part of the plaintiffs' 12th. He would have a better chance to maintain his majority in the plaintiffs' version, however. Whereas the state adds three Milton precincts to the district, in which only 96 of 5,149 voting age residents are African Americans, the plaintiffs' version adds only two precincts, containing 93 African Americans out of only 3,424 voting age residents of Milton. In both districts, the opportunity that African Americans have to elect representatives of their choice would be a more reasonable one in the plaintiffs' versions.

## REBUTTAL TO REPORT OF HAROLD W. STANLEY

27.     The following section responds to what is labeled the "Preliminary Report" of Harold W. Stanley in these cases.

---

[12]  In the state's version of the 11th Suffolk, the EI estimate for Mr. Jenkins' vote among the African Americans is 91.6 percent. The regression estimate is an impossible 218 percent. These estimates for the plaintiffs' version are 90.6 percent in EI and 107 percent in regression.

[13]  The EI estimate of Mr. Jenkins' vote among African Americans in the Boston portion of the state's 12th district is 92.1, while the regression estimate is 102.8. These estimates for the plaintiffs' version are 91.1 percent and 97.2 percent respectively.

28.     Professor Stanley purports to identify, among the 17 state House of Representatives districts that are wholly within, or contain parts of, the City of Boston, those that provide non-Hispanic black voters "an opportunity to elect candidates of their choice" (para. 103). He identifies six such districts; Districts 5, 6, 7, 9, 11, and 12. He also suggests, but does not actually conclude, that one of these 17 districts, the 15th, likewise provides Latino voters with "an opportunity to elect a candidate of choice" (para. 105).

29.     Prof. Stanley further states that the six districts identified as providing these opportunities to non-Hispanic blacks constitute 35 percent of the 17 districts, and that "'This percentage is more than proportional to the non-Hispanic black voting age population in the City of Boston of 22 percent" (para. 103). Likewise, he states the one district suggested to provide this opportunity to Latinos constitutes 6 percent of the 17 districts, "a percentage that compares favorably with the 9.5 percent of the citizen voting age population that is Hispanic in Boston and Chelsea" (pare. 105).

## THE IDENTIFICATION OF OPPORTUNITY DISTRICTS

30.     My first observation of Prof. Stanley's analysis is that he does not address the concern of Section 2 of the Voting Rights Act, which is the opportunities that protected minorities have to elect "representatives of their choice" within a districting arrangement. Prof. Stanley's analysis concerns only whether minorities in past elections have elected the candidates of their choice, given the particular set of candidate choices offered in those elections. A candidate preferred from among a fixed field of candidates cannot necessarily be equated with a representative of choice. The candidate options presented to voters, of course, are themselves influenced by the districting arrangements, which determine the demographic composition of the districts.

- 12 -

31.     As my reports and affidavits in these cases revealed, African Americans in Boston and Latinos in Chelsea have demonstrated a preference, through their voting behavior, to be represented by people from within their own group. This preference for African American and Latino representatives has not been shared by the non-African American voters in Boston nor the non-Latino voters in Chelsea. Given this, an African American or Latino "opportunity to elect" within a new districting arrangement must include the opportunity to elect representatives from within their own group. In short, the ability of minority voters to be on the winning side of an election held in a district with a majority non-African American or non-Latino electorate, in which none of the candidates, or none of the major candidates, are from within their group, does not demonstrate that that the district provides them with an opportunity to elect a representative of their choice. Elections involving choices between or among African American and non-African Americans candidates, or Latino and non-Latino candidates, are widely considered to be the most probative in polarized voting analyses because only these types of elections can reveal whether such differences in representational preferences exist among voters. This is the reason that I analyzed elections of this type in Boston and Chelsea in my initial reports in these cases.

District 11

32.     District 11 is one of the districts Prof. Stanley identifies as an African American opportunity district. As noted above, the candidate options presented to voters, of course, are themselves influenced by the demographic characteristics of the districts. Given the limited presence of non-Hispanic blacks (hereinafter referred to as blacks or African Americans) in District 11, it is not surprising that only one of the 15 candidacies in the six election contests in that district analyzed by Prof. Stanley, from the 1994 general election through the 2002 Democratic primary (Stanley Appendix 2), was that of an African American (a candidate that

- 13 -

received only 11.6 percent of the votes cast for the candidates listed on the ballot for the 2002 primary). The voting age population in this district in the districting arrangement adopted in 1993 was 35.1 percent black, based on the 1990 census, and even lower, 32.8 percent, based on the 2000 census. The new district adopted in 2001 is even less black, 20.1 percent black based on the 2000 census. If representational preferences are divided along racial lines a district that ranges from 35.1 percent black in voting age population to 20.1 percent, is likely to have a chilling effect on African American candidacies. One cannot conclude, therefore, that African Americans in this district, past and present, have had an opportunity to elect representatives of their choice, simply because they prefer the winning candidate in what are essentially all-white fields of candidates.

33.    Dr. Stanley's own analysis of the elections in this district reveals that his determinations of the candidates of choice of blacks in these elections are themselves tenuous. He maintains that valid regression estimates of voting behavior are available for three of the six elections, the 1994, 1998, and 2000 general elections (para. 86), and that the white candidates that won in these elections were the candidates of choice of black voters in these elections.

34.    The first election analyzed is the 1994 general election, in which a white candidate, McDonough, is identified as the candidate preferred by blacks. While McDonough is the candidate found to receive the most votes from blacks, far more of the blacks turning out for this election, according to Stanley Appendix 2, are recorded as leaving their ballots blank or casting a write-in vote. McDonough is recorded as receiving a vote from 26.2 percent (3.31/12.63) of the blacks turning out for this election. This contrasts with 74.7 percent (9.44/12.63) of them being listed as "Blank/Other." While McDonough may have received more

votes from African Americans than the other candidate in this election, given these voting patterns, he or she can hardly be considered a *representative* of their choice.

35. The same is true for the 1998 and 2000 general elections in District 11. In 1998 Malia is supported by 16.8 percent (1.82/10.81) of the African Americans turning out, which is more than the other candidate in that election, but 83.0 percent (8.97/10.81) of the African Americans turning out are recorded as casting "Blank/Other" ballots in this contest. In the 2000 general election, the difference is even larger. Malia is reported to have received a vote from 8.7 percent (2.03/23.33) of the African Americans turning out, while the percentage recorded as "Blank/Other" is 90.7 percent (21.16/23.33). Malia likewise can hardly be considered a representative of choice.

36. In the other three elections in District 11, the 1998 special general election, the 1998 Democratic primary, and the 2002 Democratic primary, Prof. Stanley reports that valid estimates of voting behavior for African Americans (and Latinos) cannot be derived through regression analysis (para. 85). The turnout estimates for these groups in these elections are negative numbers. This would indeed lead to questionable point estimates for the levels of African American (and Latino) candidate support, yet the coefficients that Prof. Stanley does report in Appendix 2 for each of these elections point to Malia as not being the candidate of choice of African Americans. In the 1998 special general election, that person would be a Hispanic candidate, Gonzales, who would likewise be the choice of Latino voters. In the 1998 Democratic primary, it would be Wilson, whose race is listed as unknown, and in the 2002 Democratic primary it would be the African American Payne-Thomson, a minor candidate that received 602 votes out of 5,181 cast for candidates listed on the ballot (11.6 percent).

37.     There is nothing in the analyses of the elections in District 11, past or present, that would indicate that this district has or does provide African Americans with an opportunity to elect a *representative* of their choice. The version of this district in the post-2000 census districting plan for the House of Representatives is 20.1 percent African American in voting age population. As reported in paragraphs 23 and 24 above, if the 2002 District Attorney election is examined in the geographical area constituting the new District 11, the candidate preferred by African American voters, fellow African American Mr. Jenkins, is defeated by the candidate preferred by the non-African American voters, Mr. Conley. The new District 11 might provide, at best, an opportunity for African Americans to be on the winning side of essentially white-on-white elections. It is not a district, however, that provides a comparable opportunity to elect a representative of their choice should that choice be an African American. District 11 therefore should not be classified as an African American opportunity district.

District 12

38.     Prof. Stanley also includes District 12 among his six opportunity districts for African Americans. This district is that of the Speaker of the Massachusetts House of Representatives, Thomas Finneran. Mr. Finneran, a white, was first elected to the House in 1978, over 24 years ago, in then District 15. While the voting age population figures for the 1980 census for that district at that time are not available, total population figures indicate the district was 55.4 percent African American. If the 1980 citywide figures for voting age as a percent of total population, for African Americans and non-African Americans in Boston, are used to estimate the voting age population percentage in the district, the African American percentage of the voting age population is less than a majority, 49.8 percent. The 1978 election in this district was a four-candidate contest in which one candidate was an African American, but he received

only 279 votes. Mr. Finneran has served as Speaker since 1995. The last time he faced opposition for reelection was in 1990, in the Democratic primary and general election in what was then District 13. These were the only elections analyzed by Prof. Stanley. The race of his opponents in the primary are recorded by Prof. Stanley as white and unknown, while his opponent in the general election is recorded as white. His opponents in the primary received only 15.2 percent and 8.3 percent of the non-write in votes, and his opponent in the general election received 19.5 percent of the non-write in votes. Prof. Stanley's analyses indicate that Mr. Finneran was the choice, among the candidates offered in these 1990 elections, of both African Americans and whites (see Appendix 2 to his report).

39. African Americans do not constitute a majority of the voting age population in the state's new District 12, although they do constitute 49.1 percent. It is unlikely, however, that this district will provide African Americans with an opportunity to elect a representative of their choice, if their choice were an African American. As set out in paragraphs 25 and 26 above, an examination of the votes cast in the 2002 District Attorney election within this district reveals that the African Americans in the Boston portion of the district strongly preferred the African American candidate, Mr. Jenkins. Whether Mr. Jenkins would win a majority, or even a plurality, in the district overall is unlikely, however. Mr. Jenkins won 51.2 percent of the votes cast in the Boston portion of the district, a margin of 183 more votes than his white opponents. The remainder of the district is comprised of three precincts in Milton, however, in which only 96 of the 5,149 people of voting age are African American. While these people outside of Boston were not allowed to vote in the District Attorney election, the predominantly white nature of the Milton precincts in the district suggests that if they had been, Mr. Jenkins would not be likely to win in the entire district.

40. Whether a district provides a reasonable opportunity for African Americans to elect a representative of their choice must be assessed in the context of alternative ways the district could be constructed. The plaintiffs in the <u>Black Political Task Force</u> case have provided an illustrative District 12 in which Mr. Jenkins receives 56.8 percent of the votes cast in the Boston portion of the district, with the Milton portion consisting of only two precincts containing only three fewer African Americans of voting age, 93, out of a total voting age population of only 3,424, which is 1,725 fewer than in the Milton portion of the state's district.

41. Given the illustrative district provided by the <u>Black Political Task Force</u> plaintiffs, District 12 in the state's plan should be considered as diluting the vote of African Americans, rather than providing them with an opportunity to elect a *representative* of their choice.

<u>District 9</u>

42. A third district that Prof. Stanley includes among the six African American opportunity districts is District 9. This district, in which African American Byron Rushing is the incumbent, can be traced back to the district that elected his predecessor in 1974, African American Mel King. In 1974 Mr. King was elected in the district through unusual circumstances. The closest census figures available to me, those for 1980, indicate that the district was 23.9 percent African American in total population. Mr. King ran in the Democratic primary in the district in 1974 but was not successful. He received 28 percent of the vote. Four white candidates split the remainder of the vote, with William Carey receiving the most, 32 percent of the total vote.

43. I am informed that after losing the Democratic nomination, Mr. King ran a "sticker" write-in campaign in the general election, in which stickers containing his name were provided to voters to attach to the write-in portion of the ballot. Mr. King competed with two

white candidates, Mr. Carey the Democratic nominee and Margaret Donnell the Republican nominee. Mr. King won a close plurality of the votes. He won 40.8 percent of the total votes, with the two white candidates dividing the remaining 59.2 percent. Mr. Carey won 39.2 percent, only 249 votes behind Mr. King out of a total vote of 16,149. Ms. Donnell won another 3,228, or 20 percent.

44.     Once gaining the seat, Mr. King held it until the 1982 election, in which Byron Rushing, another African American, succeeded him. Mr. Rushing has held the District 9 seat since. He had a reelection contest only once in the post-1990 version of the district, that being in the Democratic primary in 1998. The district was 17.3 percent African American in voting age as of the 2000 census. Prof. Stanley's analysis of the 1998 election indicates that Mr. Rushing, having served 16 years in the House by this time, was the choice of 85.3 percent of the African Americans voting in this particular election but was only a plurality choice of the "white" (technically non-African non-Hispanic) voters. His percentage of the white vote was 43.3, with his two white opponents splitting the rest of that vote with 34.5 percent and 22.2 percent.[14]

45.     The state's new District 9 has been reduced to only 12.7 percent African American in voting age population according to the 2000 census. Mr. Rushing was not opposed for reelection in 2002. He is now a ten-term incumbent. Given the small African American presence in this district, it cannot be assumed that African Americans will have an opportunity to elect a representative of their choice in this district, should that person be an African American, in an open seat contest in which their choice does not benefit from a long term incumbency.

---

[14] My analysis of this election concerns the vote cast by the Boston voters in this district. That analysis, reported in para. 20 above, indicated that among Boston voters casting votes in this election, Mr. Rushing received 85.7 percent of the African American vote based on regression, and 62.0 percent based on EI. His support among the Boston non-African Americans casting votes is estimated to have been 42.9 based on regression, and 54.3 percent based on EI.

46. District 9 in the new state House plan, which is only 12.7 percent African American in voting age population, should not be considered an African American opportunity district. The opportunity provided to African Americans in a district to elect a representative of choice must not be contingent on the opportunity to elect a particular, and in this instance, long term incumbent. The opportunity must apply to an open seat contest for the district seat as well. Given that District 9 is now only 12.7 percent African American in voting age population, it cannot be considered an African American opportunity district.

### Given Prof. Stanley's Criterion, Districts 9 and 11 must be White Opportunity Districts

47. Prof. Stanley states, in para. 102 of his report, that Districts 7 and 12 should be considered African American opportunity districts because "the high black population percentages of the voting-age population in these districts (42.6 and 52.0 percent respectively) provide support for the conclusion that in these districts black voters, if politically cohesive, have the opportunity to elect a candidate of choice." Unless Prof. Stanley's decision rules are racially selective, it must certainly be the case, based on this criterion, that Districts 9 and 11, in which whites constitute a majority of the voting age population, 60.2 percent and 50.7 percent respectively, must be considered to be white opportunity districts.

### District 15

48. Prof. Stanley also suggests, on the basis of the 2002 Democratic primary and general election, that District 15 is a Latino opportunity district, the only district so identified, despite the district being only 16.2 percent Latino in voting age population. This is because a Latino candidate, Jeffrey Sanchez, won a six-candidate Democratic primary in this district in 2002 with only 34.4 percent of the vote. (His vote among "white" voters is estimated to have

been 29.2 percent.) With the benefit of the Democratic nomination, he won easily in the subsequent general election, receiving 76.8 percent of the vote.

49.    Prof. Stanley concludes that valid estimates for Latino (and African American) voting behavior cannot be obtained for these elections in District 15, no doubt due to the limited presence of these groups within the precincts within the district. While Prof. Stanley is unable to obtain specific point estimates for candidates, the coefficients that Prof. Stanley does report in Appendix 2 reflect relative support and point to another Latino candidate, whose surname is Lopez, as the candidate most preferred by the Latino voters in this district (with three times the support of Mr. Sanchez among these voters).

50.    There is no clear evidence that Latino voters in District 15 elected the candidate of their choice in 2002. Prof. Stanley's suggestion that this district is a Latino opportunity district is based on his statement, "if we consider this district one in which Hispanic voters have an opportunity to elect a candidate of choice such as Sanchez," (para. 105, emphasis added), then this district, according to him, can be classified as the only Latino opportunity district among the 17 districts containing at least part of Boston.

51.    Given Prof. Stanley's classification of Districts 7 and 12 as African American opportunity districts, based on the African American percentage of the voting age population within them (see para. 47 above), then District 15 must also be considered a white (or Anglo) opportunity district, given that the district is 59.1 percent non-Hispanic white in its voting age population according to the 2000 census.

52.    Prof. Stanley does not identify the state's new District 2 as a Latino opportunity district. This district is 32.3 percent Latino in voting age population. He performs only one analysis of an election for this district, the Democratic primary in 1996 in which only non-Latino

white candidates were on the ballot. As discussed above in para. 31, this election provides no information about whether Latinos could have elected a representative of their choice in the district at that time, or could in the district as it is now, if their preference was or is to be represented by Latinos. Relying on voting age population figures, Prof. Stanley concludes that "reliable estimates" of the preferences of Latinos and African Americans cannot be derived for this election. This does not mean the same is true of the estimates of Latino support for candidates in Chelsea and within District 2 that are provided in my reports and affidavit for the Camacho case. These estimates are based on a better measure of the relative presence of Latinos in the precincts, the percentage of the voters receiving ballots for each election that has a Spanish surname.

53.    Unlike the state's District 2, which is 32.3 percent Latino in voting age population, the plaintiffs' illustrative District 2 is a majority Latino in voting age population, 50.7 percent. An analysis of the vote within that illustrative district in the 2002 Democratic primary for the Middlesex, Suffolk, and Essex senate district, reported in my reports and affidavit in the Camacho case, indicates that the Latino candidate in that election, Mr. Barrios, would likely have carried a majority of the votes within the plaintiffs' illustrative district. He did not receive a majority of the vote in District 2 as drawn by the state.

## PROPORTIONALITY

54.    Prof. Stanley's conclusion that African American voters have "an opportunity to elect candidates of their choice" in six of the 17 districts, or 35 percent, is the basis for his statement that these opportunities are "more than proportional to the non-Hispanic black voting age population in the City of Boston of 22 percent" (para. 103). Likewise, his suggestion that District 15 provides such an opportunity for Latino voters is the basis for suggesting that this

opportunity is present in six percent of the districts, one of 17, and his statement that this "compares favorably with the 9.5 percent of the citizen voting-age population that is Hispanic in Boston and Chelsea" (para. 105).

55. As stated above, I would not identify Districts 9, 11, or 12 as African American opportunity districts, nor would I identify District 15 as a Latino opportunity district, if "opportunity" refers to the election of representatives of choice for these minority groups. Neither of these groups, therefore, have a number of opportunity districts comparable to their percentage of the voting age population.

56. In addition, voting age population should not be the basis for comparison in determining whether the number of opportunities to elect representatives of choice provided through a districting arrangement is proportional. Boston was allocated seats in the Massachusetts House of Representatives based on its total population, not on its voting age population, nor its citizen voting age population. Likewise, districts themselves are based on total population, not voting age population, nor citizen voting age population. Total population, in short, is what districts are based on, and given this, total population percentages should serve as the basis for assessing whether the number of opportunities is proportional. Voting age population figures within districts need to be considered in determining the number of opportunities provided, given that only people of voting age may vote, but they should not serve as the basis for an assessment of proportionality. The proportionality determination should be based on what districts are made from, which is total population, of which African Americans and Latinos constitute 23.8 percent and 14.4 percent respectively in Boston.

57. Even if the proportionality determination is based on voting age population, or citizen voting age population, the determination should not be made in a racially selective

manner. Given his determination of opportunity districts, Prof. Stanley claims that African Americans have a more than proportional number of opportunities, based on voting age, and that Latinos have a "favorable" number based on citizen voting age population (even though proportionality would require two opportunity districts, given that 9.5 percent of 17 districts is 1.6 districts). No comparable comparison of opportunities are reported for non-Hispanic whites in these districts, however.

58.     Non-Hispanic whites constitute an absolute majority of the voting age population in 12 of the House districts in the state's new plan (Districts 1, 2, 3, 4, 8, 9, 10, 11, 14, 15, 17, and 18). Given Prof. Stanley's determination that "high" voting age percentages provide groups with opportunities to elect candidates of their choice (see para. 47 above), then under this criterion these 12 districts must be considered white opportunity districts. In addition, non-Hispanic whites constitute 48.1 percent of the voting age population in District 13, which is higher than the 42.6 percent black voting age that Prof. Stanley found qualified District 7 as a black opportunity district (see para. 47 above). Further, whites have been able to elect candidates of their choice, according to Prof. Stanley, in District 5 (see Appendix 2 to Stanley's report). Thus, even without considering Finneran a candidate of choice of white voters in District 12, this results in 14 of the 17 districts being white opportunity districts, using Prof. Stanley's decision rules, or 82.4 percent.

59.     Given that non-Hispanic whites constitute 55.4 percent of Boston's voting age population, they clearly have the most disproportionate number of opportunities in the new districting arrangement, with the percentage of opportunities exceeding their percentage of the voting age population by at least 27 percentage points. If Mr. Finneran is considered the choice of white voters, the number of opportunity districts for whites increases to 15, placing the

percentage of districts providing an opportunity at 88.2, which is 32.8 percentage points above their percentage of the voting age population. African Americans and Latinos can hardly be considered to have an equal opportunity to elect candidates of their choice, compared to whites, within these Boston, and Boston and Chelsea, districts.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this

14 day of August, 2003.

Richard L. Engstrom