UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAGALY CAMACHO, et al.<br><br>Plaintiffs<br><br>v.<br><br>WILLIAM FRANCIS GALVIN,<br>in his official capacity as Secretary of the<br>Commonwealth of Massachusetts,<br><br>Defendant. | **CIVIL ACTION NO. 2002-10428-DPW** |
| BLACK POLITICAL TASK FORCE, et al<br><br>Plaintiffs,<br>v.<br><br>WILLIAM FRANCIS GALVIN, in his capacity<br>as Secretary of the Commonwealth of<br>Massachusetts,<br><br>Defendant. | **CIVIL ACTION NO. 2002-11190 DPW** |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE
AFFIDAVITS OF HAROLD W. STANLEY**

Defendant William Francis Galvin, in his capacity as Secretary of the Commonwealth of Massachusetts ("Secretary Galvin" or "defendant") hereby opposes Plaintiffs' *Motion to Strike Affidavits of Harold W. Stanley*. The testimony that is the target of Plaintiffs' motion is contained in the July 10, 2003 *Affidavit of Harold W. Stanley* (herein, "Stanley Aff."), and the

July 10, 2003 *Supplemental Affidavit of Harold W. Stanley* (herein, "*Stanley Supp. Aff.*").[1] In support of his opposition, Secretary Galvin states as follows:

## I. INTRODUCTION

Plaintiffs have moved to strike *altogether*, the expert testimony of Professor Harold W. Stanley, notwithstanding that Professor Stanley has been qualified as an expert and has given expert testimony in Voting Rights Act cases approximately twenty times since 1986 and has been selected *by the Court to serve as its own expert* in four Voting Rights Act cases in the Southern and Middle Districts of Alabama. See *Stanley Aff.*, ¶¶ 8-10. Plaintiffs make no contention that Professor Stanley lacks the experience, expertise or qualifications to serve as an expert witness in these cases. Notably, Plaintiffs do not argue that Professor Stanley's testimony is inadmissible under the standards for admission of expert testimony set forth in Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993) and Kumho Tire Company v. Carmichael, 526 U.S. 137 (1999).

Nonetheless, Plaintiffs seek, wholesale, to exclude Professor Stanley's testimony by making four meager attacks on its substance. Plaintiffs offer the Court neither case authority nor citation to any provision of the Federal Rules of Evidence which dictates the result they seek. At most, plaintiffs make a glancing reference to the language of Fed.R.Evid. 403, when they suggest that permitting the three-judge panel to consider Professor Stanley's testimony could be "potentially prejudicial" to the plaintiffs' cases. Plaintiffs seem not to recognize that <u>all</u> relevant and admissible evidence may be "potentially prejudicial" to the claim or defense of a party. The real issue is whether, in the language of Rule 403, "although relevant" the probative value of the

---

[1] Plaintiffs also reference a third "Second Supplemental Affidavit of Harold W. Stanley" at n.1 to their motion, but no such affidavit was served or filed in these cases. The defense does not know what phantom testimony this aspect of plaintiffs' motion is directed to.

evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the [fact-finder]." Fed.R.Evid. 403. Plaintiffs fail to make a real argument that Professor Stanley's testimony is inadmissible based on any of the grounds set out in Rule 403.

Instead, plaintiffs contend that Professor Stanley's testimony should be stricken because they contend that the approach he has taken to examining the second and third Gingles preconditions; i.e., minority group cohesion and legally significant white bloc voting,[2] in which Professor Stanley has used the standard methodologies utilized in these case since Gingles was decided in 1986, led him to reach conclusions that are insufficiently probative of the question whether plaintiffs have met their burden of proof on this aspect of their case to be useful to the Court in determining these cases. Plaintiffs' arguments uniformly go to the weight, and not the admissibility of the testimony, and indeed, the motion itself, appears calculated less as a genuine motion *in limine*, than as an opportunity for Plaintiffs to put arguments before the Court that are better left for closing argument and post-trial briefing.

Plaintiffs' complaints about Professor Stanley are fourfold -- that (i) he focused on endogenous elections (i.e., elections involving seats to the body that is the subject of Plaintiffs' claims) even though many of the contests at issue did not include candidates of different racial or ethnic backgrounds; (ii) he used what Plaintiffs contend is an inappropriate definition of the phrase "candidate of choice" in examining election results; (iii) he used an inaccurate term to

---

[2] See Thornburg v. Gingles, 478 U.S. 30, 51 (1986) (describing second and third preconditions); Vecinos de Barrio Uno v. Holyoke, 72 F.3d 973, 979-80 (1st Cir. 1995) ("Uno III") (describing second precondition as requiring a showing by plaintiffs that the minority group is "politically cohesive" and third precondition as requiring a "showing [by plaintiffs] that the majority votes sufficiently as a bloc to enable it, in the ordinary course, to trounce minority-preferred candidates most of the time.") As the First Circuit in Uno III observed, "Each of these showings must be specific to the electoral unit that is under fire." Id. Here, that unit is the districting plan for electing representatives to the Massachusetts House of Representatives from those 17 single-member districts which lie wholly or partially within Suffolk County.

3

refer a group comprised of all persons other than African American and Hispanic persons; and (iv) he applied a definition of the phrase "politically significant" with which Plaintiffs disagree. None of the contentions have merit, and most importantly, none form an appropriate basis on which to strike Professor Stanley's testimony in these cases. Whether considered separately or together, these contentions do not support the exclusion of Professor Stanley's testimony.

## II. ARGUMENT

### A. The Endogenous/Exogenous and White on White, Black on Black Issue

In accord with the requirement that the second and third Gingles preconditions be assayed with regard to the electoral unit that is the target of Plaintiffs' claims in these cases (see n.2, *supra*), Professor Stanley determined that the most probative election results to examine were those in so-called "endogenous elections", i.e., elections involving races for the Suffolk County-based seats in the House of Representatives – the offices affected by the redistricting plan that is the subject of the plaintiffs' claims.[3] Professor Stanley's rationale for making this choice is set forth in detail in his affidavits. See *Stanley Aff.*, ¶¶ 28-29; *Stanley Supp. Aff.*, ¶¶ 2-5.

Professor Stanley's choice is also supported by cases which find such elections substantially more probative than those from exogenous elections, in which the office at issue is different, the election cycle may be different, the district from which a candidate runs will be different, the method of election to the office may differ, the degree to which a contest for the office in question may be less (or more) compelling to the electorate and corresponding practical political considerations, such as fundraising, advertising, staffing, etc., all differ, from the factors pertinent to election to the office actually at issue in the case. See Uno III, 72 F. 3d at 996;

---

[3] As opposed to races for other offices, such as those for at-large City Council seats, the Mayoralty of the City of Boston and the office of Suffolk County District Attorney, which are at-large races covering geographic areas with more than ten times the population of the single-member districts at issue here.

4

Monroe v. City of Woodville, 881 F. 2d 1327, 1330 (5th Cir.), *modified in other respects,* 897 F. 2d 763, cert. denied, 498 U.S. 822 (1990). See also Citizens For a Better Gretna v. City of Gretna, 834 F. 2d 496, 502 (5th Cir. 1987) (exogenous elections alone cannot prove racial bloc voting), cert. denied, 492 U.S. 905 (1989); Carrollton Branch of NAACP v. Stallings, 829 F.2d 1547, 1558 (11th Cir. 1987) (in Gingles inquiry, elections for seats on challenged governmental body more probative than those of other elections in region), cert. denied, 485 U.S. 936 (1988); Johnson v. Hamick, 196 F. 3d 1216, 1222 (11th Cir. 1999) (endogenous elections are more probative than exogenous elections); Goosby v. Town Board of Hempstead, N.Y., 180 F. 3d 476, 497 (2d Cir. 1999) (same), cert. denied, 528 U.S. 1138 (2000); Clark v. Calhoun Co, Miss., 88 F. 3d 1393, 1397 (5th Cir. 1996.) (same); N.A.A.C.P., Inc. v. City of Niagara Falls, New York, 65 F. 3d 1002, 1015 n.16 and 1016 (2nd Cir. 1995) (court relied on exogenous elections and held that reliance on white versus white elections is appropriate); Montano v. Suffolk County Legislature, 2003 U.S. Dist. LEXIS 10407 at *50 (E.D.N.Y. 2003) (reliance on exogenous elections inappropriate in the case); France v. Pataki, 71 F. Supp. 2d 317, 326 (S.D.N.Y. 1999) (same).

Plaintiffs turn the basket on its head when they contend that Professor Stanley made an improper choice to study white vs. white or black vs. black elections rather than elections that were white vs. black or white vs. Hispanic. As Professor Stanley's testimony establishes, this was not the choice he made at all -- he made the choice to study *endogenous elections* and it was a mere consequence of this legally and analytically appropriate choice that the pool of elections he studied involved few black on white or white on Hispanic contests.[4] Plaintiffs' contention

---

[4] In contrast, Plaintiffs' expert, Richard Engstrom, failed to examine available endogenous election results, and instead analyzed elections results from exogenous contests for offices such as Mayor, District Attorney, and At-large Boston City Council seats having little or no meaningful relationship to the dynamics of elections to a Suffolk County based single-member district House seat. See *Defendant's*

that, by making that quintessentially "expert" choice, Professor Stanley rendered his own testimony inadmissible borders on the frivolous.[5] Moreover, evidence of so called "white only" or "black only" elections may still be relevant in assessing the totality of the circumstances in a Section 2 case, especially if it tends to rebut the evidence of cohesion or white bloc voting extracted from "mixed" elections. Uno III, 72 F. 3d at 988 n.8. See also NAACP v. City of Niagara Falls, N.Y., 65 F. 3d 1002, 1016 (2d Cir. 1995) (a rule prohibiting a court from considering white vs. white elections "would project a bleak, if not hopeless, view of our society -- a view inconsistent with our people's aspirations for a multiracial and integrated constitutional democracy."); Lewis v. Alamance County, 99 F. 3d 600, 618 (4th Cir. 1996) ("principles of equal protection are offended by 'assumptions that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls'") (Internal citations omitted), cert. denied, 520 U.S. 1229 (1997).

Plaintiffs argue that only white vs. black or white vs. Hispanic contests can be used to discern whether majority bloc voting patterns will cause the defeat of black or Hispanic preferred candidates for seats elected from the 17 Suffolk County districts at issue here. The weakness of the argument is vividly illustrated by consideration of the vast differences between the demographic characteristics of the House districts at issue, and the demographic characteristics of the electoral systems to which Plaintiffs point in order to cull what they contend are the pertinent white vs. black or white vs. Hispanic contests. The results from the exogenous

---

*Motion in Limine to Exclude Testimony of Professor Richard Engstrom.* Indeed, Plaintiffs' failure to consider available endogenous election results, and to instead focus on exogenous elections, is fatal to their ability to meet their burden of proof on the second and third Gingles preconditions, and makes a full-blown trial on these cases unnecessary. See discussion, *infra*, at pp.7-10.

[5] As Professor Stanley explains in his testimony, examining exogenous election results is no substitute for examination of the available endogenous election data. See *Stanley Supp. Aff.*, ¶¶ 2-5.

6

electoral systems on which they rely -- at-large districts in the City of Boston and Suffolk County that are significantly different in their size and racial/ethnic make-up from the 17 House districts at issue in these cases – simply lack sufficient relevance and probative value to permit the Court to reliably assess whether plaintiffs in fact have an equal opportunity to participate in the political process and to elect candidates of their choice from the 17 Suffolk County House seats at issue.

There is no doubt that single-member districts present different issues than at-large districts due to their smaller size and the drawing of lines necessitated by a single-member district plan. See Georgia v. Ashcroft, 2003 U.S. LEXIS 5012; Voinovich v. Quilter, 507 U.S. 146 (1993). The Supreme Court, in both Georgia and Voinovich recognized that in performing the task of redistricting, a state may properly choose to concentrate or disburse the population of a protected minority group in an effort to protect its rights under Section 2 or Section 5 of the Voting Rights Act. The statute does not dictate that a state must pick one of these methods of redistricting over another. Instead, the statute permits a state to choose the approach it wishes to effectuate. Georgia v. Ashcroft, *supra*. at * 36-37,39 ( a state may choose to create a certain number of "safe" districts in which it is highly likely that minority voters will be able to elect the candidate of their choice).

In the present cases, the result of the redistricting process in the 17 Suffolk County House districts at issue yielded districts that provide much greater opportunity to groups of voters protected by the statute than the exogenous electoral systems on which plaintiffs rely in an effort to demonstrate their dilution claim, i.e., the at-large systems for electing the Mayor and at-large members of the City Council in the City of Boston, and the at-large system for electing the

District Attorney for Suffolk County – jurisdictions which are very predominately comprised of non-Hispanic White voters. The City of Boston provides a good example.[6]

On a CVAP basis, non-Hispanic black persons make up only 21.77% and 20.36% of the citywide CVAP on the "combined" and "alone" bases, respectively. (D's *Exs. E* and *G*) On a VAP basis, non-Hispanic black persons comprise 22.07% and 20.50% of the citywide VAP on the "combined" and "alone" bases, respectively. (D's *Exs. A and B.*) If non-Hispanic white voters in the city at-large were to vote as a significant bloc against a black preferred candidate, such a candidate would not prevail in an at-large election. However, this hypothetical is irrelevant to the present cases since nether case deals with a citywide at-large electoral system.

The single-member system at issue in these cases presents a very different dynamic. This is demonstrated by contrasting the above citywide numbers in the City of Boston with the black composition of the districts about which the BPTF plaintiffs complain. When that is done on a CVAP basis, it is evident that a black preferred candidate supported by a cohesive black electorate has an excellent chance of prevailing in the 5th, 6th, $7^{th\ and}$ 12th Suffolk districts since the black CVAP in these districts on a "combined basis" (the basis the Supreme Court in Georgia v. Ashcroft, *supra.* at *25 n.1 held should be used), is 60.9%, 84.8%, 45% and 48.8%, respectively – not the 20% to 22% it would be on a citywide basis. (D's *Ex. G.*)[7] The same is true if VAP is considered, since those same districts would be 55.93%, 82.42%, 42.59% and 52.01% black on

---

[6] There should be no dispute that the results of the following analysis would be even more extreme if Suffolk County were considered, since the non-Hispanic white share of the citizenship voting age population ("CVAP") or voting age population ("VAP") of the county, which, in addition to the City of Boston, also includes the cities of Revere and Chelsea and the Town of Winthrop, is greater than it is within the City of Boston.

[7] On a CVAP "alone" basis, the respective numbers for the districts would be 54.9%, 81.1%, 42.7% and 46.3%. *Id.*

8

the "combined" basis. (D's *Ex. H.*)[8] Assuming, *arguendo*, the presence of a black political cohesion and non-Hispanic white racial bloc voting, the black electorate clearly has a much greater opportunity to elect a candidate of choice from single-member House districts in which it comprises between 42.59% and 82.42% of the VAP than it would to elect a preferred candidate in a citywide race in which it comprises only 20.36% to 21.77% of the CVAP and 20.50% to 22.07% of the VAP.

Notwithstanding this substantial distinction between the House districts actually at issue in these cases and the city or county-wide electoral system results relied on by Plaintiffs, Plaintiffs suggest that the court should turn its back on the endogenous election results from the House districts at issue and instead focus on the <u>extremely</u> exogenous election results they examined because there are not a sufficient number of white vs. black or white vs. Hispanic endogenous elections to reach a meaningful conclusion on the existence and impact, if any, of racial bloc voting. The obvious folly of this approach is that the Plaintiffs' approach demands that the Court attempt to draw meaningful conclusions about the dynamics of elections to House seats from the results of at large elections that are the proverbial apples to the proverbial oranges of elections held in the much smaller and demographically different House districts.

Plaintiffs ask the Court to perform a kind of electoral system Tarot card reading, based on data so untethered to the system Plaintiffs challenge as to provide the Court with no real guidance. As outlined above, it is the demographics of the House districts that provides meaningful information to the court, assuming black political cohesion. The Court can indeed reliably glean the information necessary to assess the degree of minority cohesion and bloc voting from the endogenous elections in the absence of black v. white or Hispanic v. white

---

[8] On the VAP "alone" basis, the respective numbers would be 49.73%, 78.42%, 40.25% and 49.10%. *Id.*

elections where, as here, the constructed districts, at a minimum, provide black voters with the "opportunity" (rather than a guarantee), to elect their representatives of choice from a number of districts that either exceeds, equals or roughly equals their share of the citywide CVAP and VAP. See *Defendant's Trial Memorandum* at pp.29-36.[9]

In view of the undisputed facts regarding the vast difference between the at-large systems on which Plaintiffs rely and the single-member districts that are actually at issue in these cases, Plaintiffs' contention that Professor Stanley's testimony is rendered inadmissible because he examined endogenous rather than the <u>extremely</u> exogenous election data relied on by Plaintiffs is plainly off the mark. The first basis on which Plaintiffs seek to strike Professor Stanley's testimony is without merit.

### B.     The "Candidate of Choice" Issue

In a similar vein, Plaintiffs next contend that Stanley's testimony must be stricken because he considers the candidate who received the most votes from voters of a particular racial or ethnic group in an election contest to be that group's "candidate of choice" in that contest. Plaintiffs' contention is meritless, and Plaintiffs' suggestion that no white candidate could ever be genuinely considered the candidate of choice of black or Hispanic voters in an election in the absence of a contest between a black and white or white and Hispanic candidate runs well afoul of the concerns expressed by the <u>City of Niagara Falls</u> and <u>Alamance County</u> courts quoted, *supra*, at p. 6. See also <u>Uno III</u>, 72 F.3d at 991 (noting that the goals of the Act "are poorly served by balkanizing electorates and carving them into racial fiefdoms); <u>Johnson v. DeGrandy</u>, 512 U.S. 997, 1027, 114 S. Ct. 2647, 2665 (1994) (Kennedy, J., concurring) ("The assumption that majority-minority districts elect only minority representatives, or that majority-white

---

[9] The same holds true for Hispanic voters. *Id.*

10

districts elect only white representatives, is false as an empirical matter. And on a more fundamental level, the assumptions reflect "the demeaning notion that members of the defined racial groups ascribe to certain "minority views" that must be different from those of other citizens'." [citations omitted]); Nipper v. Smith, 39 F.3d 1494, 1540 (11th Cir.1994) (*en banc*) (2 Judge portion of majority opinion) (holding that white on white elections are probative of racial polarization and, therefore, implicitly holding that some white candidates can be truly "black preferred"), cert. denied, 514 U.S. 1083, 115 S. Ct. 1795 (1995); S.C.L.C. v. Sessions, 56 F.3d 1281, 1293-94 (11th Cir.1995) (*en banc*) (affirming trial court's consideration of all relevant evidence including white on white elections), cert. denied, 516 U.S. 1045, 116 S. Ct. 704 (1996).

Professor Stanley's approach is well supported by cases addressing the issue. See Vecinos de Barrio Uno v. Holyoke, 950 F. Supp. 515, 519-520 (D.Mass.1997) ("Uno V") (candidate receiving the most votes from the minority group at issue is the candidate of choice of the voters from that group who voted in that contest); Ruiz v. City of Santa Maria, 160 F. 3d 543, 552 (9th Cir. 1998), cert. denied, 527 U.S. 1022 (1999); NAACP v. City of Niagara Falls, N.Y. 65 F. 3d 1002, 1019 (2d Cir. 1995); Lewis v. Alamance County., 99 F. 3d 600, 614 (4th Cir. 1996), cert. denied, 520 U.S. 1229 (1997); Clarke v. City of Cincinnati, 40 F. 3d 807, 810 (6th Cir. 1994), cert. denied, 514 U.S. 1109 (1995).

Plaintiffs' argument, suggesting that only black candidates can genuinely be the preferred candidate of black voters, and that as a result election returns from contests in which there was no black candidate cannot provide clues as to the electoral preferences of black voters, presents no more than a tautology, and one which is contrary to the law. As the Second Circuit observed on this question in NAACP v. City of Niagara Falls, N.Y. 65 F. 3d 1002 (2d Cir. 1995),

> [T]he Act does not delegitimate elections in which a substantial portion of a protected class expresses a preference for a candidate who is not a member of

that class. The Voting Rights Act does not provide that race alone, to the exclusion of all other factors political and social, is the Rosetta Stone of an election. The statute does not require this species of racialism, and basic American constitutional principles make us recoil from any such idea. ...

We refuse to adopt an approach precluding the possibility that a white candidate can be the actual and legitimate choice of minority voters. Such an approach would project a bleak, if not hopeless, view of our society -- a view inconsistent with our people's aspirations for a multiracial and integrated constitutional democracy. No legal rule should presuppose the inevitability of electoral apartheid -- least of all a rule interpreting a statute designed to implement the Fourteenth and Fifteenth Amendments to the Constitution. Indeed, any such rule would be in tension with the Voting Rights Act's directive that members of a protected class have no right to proportional representation. *42 U.S.C. § 1973(b).*

Id. at 1015-1016. Professor Stanley's conclusions that in some of the elections he studied a non-black candidate was the preferred candidate of black voters is both well supported by the data and in accord with the law. Plaintiffs' contention that this testimony should be stricken is meritless.

Tellingly, even the cases Plaintiffs cite in support of their motion to strike do not find testimony like that given by Professor Stanley to be inadmissible. Rather, the cases discuss the relative weight to be given to election results in which there was no minority candidate and decline to conclude that a white candidate in a white on white election cannot be the preferred candidate of black or Hispanic voters. See Askew v. City of Rome, 127 F.3d 1355, 1378-1379 (11th Cir. 1997) (rejecting plaintiffs' contention that no candidate preferred by black electorate can be found in contests lacking a black candidate); Nipper v. Smith, 39 F.3d 1494, 1540 (11th Cir. 1994) (observing that "we do not foreclose the consideration of electoral races involving only white candidates.")[10]

---

[10] Notably, in Askew the Court declined to consider evidence of exogenous elections proffered by the plaintiffs (Askew, 127 F.3d 1381 at n.13) and in Nipper, the Eleventh Circuit noted without criticism that the district court had declined to rely on evidence proffered by plaintiffs concerning exogenous elections. Nipper, 39 F.3d 1494, 1504 n.22.

12

Finally Plaintiffs' contention that the Court should strike Professor Stanley's testimony because he does not draw the inference that plaintiffs do regarding "blank ballots" cast in the elections he studied, i.e., that such ballots were "protest" votes against the candidates running for office, is not only meritless, it is completely without evidentiary support. Plaintiffs do not know, any more than anyone else, why any particular voter failed to cast a vote for a candidate in a particular race, or when he or she did cast a vote in another race on the same ballot. Myriad non-racial explanations for such behavior come immediately to mind – including that the voter was not interested in the race at issue; that the race was not tight, and the voter felt no urgency to choose a candidate for the race; or that the voter was not familiar with the candidates, and did not want to cast an uniformed vote.

The argued-for "protest vote" inference is not the sole rationale inference which can be taken from the presence of mute blank ballots in some races. Plaintiffs' contention that Professor Stanley's testimony is inadmissible because he does not arrive at the same conclusion plaintiffs do regarding the significance of these ballots borders on the absurd.

### C. The Use of the Term "Whites"

Plaintiffs next contend that Professor Stanley employed a "strange and misleading definition" of "non-Hispanic whites" and "whites" in his testimony and improperly included within the terms persons who fell into other census categories, such as Asian, Pacific Islander and Native American. As a basis to strike his testimony, this contention is genuinely frivolous. Moreover, the so-called error has no impact on the analysis Professor Stanley has performed because the numbers of voting age citizens residing in the districts at issue in these cases who are neither non-Hispanic white, Hispanic or non-Hispanic black are not large enough to impact the results of his analysis. Simply put, this is the stuff of cross examination, no more.

### D. The "Politically Significant" Issue

Finally, plaintiffs contend that Professor Stanley's testimony should be stricken because he "misdefined" the term "politically significant." Oddly, while plaintiffs claim that Professor Stanley has misapplied a concept that lies at the core of assessing the third Gingles precondition – legally significant white bloc voting – plaintiffs cite no authority at all to support the argument that Professor Stanley has misapprehended the concept. In fact, Professor Stanley's application of the idea is spot on.

It is only where racially motivated voting patterns are deep enough to defeat minority-preferred candidates time and time again or most of the time, that bloc voting becomes legally significant. Uno III, 72 F. 3d at 983, 985. This is precisely what Professor Stanley is addressing in his affidavit when he suggests that where the preferred candidate of the minority wins election, even if some level of white bloc voting is present, it is not "politically significant" where is does not cause the defeat of the minority preferred candidate in the election at issue. See *Stanley Aff.*, ¶ 73. Stanley's testimony on this issue, far from being so off the mark as to be inadmissible, is correct. See NAACP v. City of Colombia, 850 F.Supp. 404, 415 n.6 (D.S.C. 1993), aff'd, 33 F.3d 52 (4th Cir. 1994), cert. denied, 513 U.S. 1147 (1995) (observing that no legally significant white bloc vote was present in an election where the preferred candidate of minority voters won election with combination of minority and majority crossover vote); Gingles, 478 U.S. at 56 (polarization is significant under Section 2 only if it usually results in the defeat of candidates of choice of minority voters -- in other words, where the combination of black votes and white cross-over votes is insufficient to elect the candidate preferred by black voters).

## III. CONCLUSION

Whether plaintiffs' complaints about Professor Stanley's testimony are taken separately or together, they form no basis on which to exclude any portion of his testimony. Plaintiffs' motion to strike should be <u>denied</u>.

**WILLIAM FRANCIS GALVIN,**

in his official capacity as Secretary
of the Commonwealth of Massachusetts
Defendant,

By His Attorney,
THOMAS F. REILLY
ATTORNEY GENERAL

_____
Steven P. Perlmutter (BBO #395180)
Michael D. Lurie (BBO #553024)
Mary L. Cataudella (BBO #553350)
Elizabeth C. Sackett (BBO #633649)
Special Assistant Attorneys General
Robinson & Cole LLP
One Boston Place, 25th Floor
Boston, MA 02108
(617) 557-5900

Lawrence S. DiCara (BBO #123340)
Special Assistant Attorney General
Nixon Peabody LLP
101 Federal Street
Boston, MA 02110
(617) 345-1000

Dated: September 29, 2003

# CERTIFICATE OF SERVICE

I, Michael D. Lurie, hereby certify that on September 29, 2003 a copy of the foregoing was served by hand and via electronic mail to:

Richard Benka, Esq.
Foley Hoag & Eliot LLP
155 Seaport Boulevard
Boston, MA 02210-2600
RBenka@foleyhoag.com

Rudolph Pierce, Esq.
Goulston & Storrs
400 Atlantic Avenue
Boston, MA 02110
rpierce@goulstonstorrs.com

Nadine Cohen, Esq
Lawyers Committee for Civil Rights
 Under the Law of the Boston Bar Association
294 Washington Street
Boston, MA 02108
ncohen@lawyerscom.org

Brenda Wright
National Voting Rights Institute
27 School Street, 5th Floor
Boston, MA 02108
bw@nvri.org

Burton A. Nadler, Esq
Petrucelly & Nadler, P.C.
One State Street, Suite 900
Boston, MA 02109
burt@petrucellynadleresq.com

_____
Michael D. Lurie