UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAGALY CAMACHO, et al.<br><br>Plaintiffs<br><br>v.<br><br>WILLIAM FRANCIS GALVIN,<br>in his official capacity as Secretary of the<br>Commonwealth of Massachusetts,<br><br>Defendant. | **CIVIL ACTION NO. 2002-10428-DPW** |
| BLACK POLITICAL TASK FORCE, et al<br><br>Plaintiffs,<br>v.<br><br>WILLIAM FRANCIS GALVIN, in his capacity<br>as Secretary of the Commonwealth of<br>Massachusetts,<br><br>Defendant. | **CIVIL ACTION NO. 2002-11190 DPW** |

**DEFENDANT'S COUNTERDESIGNATION OF
DEPOSITION TESTIMONY OF THOMAS M. FINNERAN**

Defendant William Francis Galvin, in his capacity as Secretary of the Commonwealth of Massachusetts ("Secretary Galvin" or "defendant") hereby designates the following testimony from the March 28, 2003 deposition of Thomas M. Finneran in response to the designations of Mr. Finneran's testimony made by plaintiffs in these actions. A copy of the portions of the deposition transcript containing the cited testimony is annexed hereto as Exhibit A.

BOST1-810360-1

| Page and Line | Page and Line |
|---|---|
| 20:1-20:16 | 110:19-110:23 |
| 45:8-46:15 | 113:20-114:2 |
| 47:17-47:24 | 125:4-125:10 |
| 56:5-56:11 | 140:19-140:21 |
| 65:1-65:5 | 147:14-147:24 |
| 65:8-65:14 | 154:9-154:15 |
| 73:1-73:8 | 167:1-167:3 |
| 106:3-106:9 | 167:19-168:2 |
| 106:17-106:22 | 168:19-169:7 |

**WILLIAM FRANCIS GALVIN,**

in his official capacity as Secretary
of the Commonwealth of Massachusetts
Defendant,

By His Attorney,
THOMAS F. REILLY
ATTORNEY GENERAL

Steven P. Perlmutter (BBO #395180)
Michael D. Lurie (BBO #553024)
Mary L. Cataudella (BBO #553350)
Elizabeth C. Sackett (BBO #633649)
Special Assistant Attorneys General
Robinson & Cole LLP
One Boston Place, 25th Floor
Boston, MA 02108
(617) 557-5900

Lawrence S. DiCara (BBO #123340)
Special Assistant Attorney General
Nixon Peabody LLP
101 Federal Street
Boston, MA 02110
(617) 345-1000

Dated: October ___, 2003

## CERTIFICATE OF SERVICE

I, Michael D. Lurie, hereby certify that on October __ , 2003 a copy of the foregoing was served by hand and via electronic mail to:

Richard Benka, Esq.
Foley Hoag & Eliot LLP
155 Seaport Boulevard
Boston, MA 02210-2600
RBenka@foleyhoag.com

Nadine Cohen, Esq
Lawyers Committee for Civil Rights
 Under the Law of the Boston Bar Association
294 Washington Street
Boston, MA 02108
ncohen@lawyerscom.org

Burton A. Nadler, Esq
Petrucelly & Nadler, P.C.
One State Street, Suite 900
Boston, MA 02109
burt@petrucellynadleresq.com

Rudolph Pierce, Esq.
Goulston & Storrs
400 Atlantic Avenue
Boston, MA 02110
rpierce@goulstonstorrs.com

Brenda Wright
National Voting Rights Institute
27 School Street, 5th Floor
Boston, MA 02108
bw@nvri.org


_____
Michael D. Lurie

# In The Matter Of:

*Magaly Camacho, et al.   v.*
*William Francis Galvin*

---

*Thomas M. Finneran*
*Vol. 1, March 28, 2003*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File FINNERAN.V1, 174 Pages*
*Min-U-Script® File ID: 0653366551*

**Word Index included with this Min-U-Script®**

Page 17

A: About six years.

Q: Mr. Rasmussen?

A: About three years.

Q: And Mr. Shea?

A: About three years.

Q: Are there any other minority staffers that you have had other than the ones that you have identified?

MR. PERLMUTTER: By "minority" you mean non-white, non-Caucasian?

MR. BENKA: Non-white.

A: I had several when I was down on the Committee on Ways and Means.

Q: Do you have a campaign staff?

A: No, sir.

Q: Do you have a treasurer or campaign manager?

A: I have a campaign treasurer.

Q: Who is that?

A: Mr. Thomas Walsh, CPA. His address is 112 Water Street in the City of Boston. I do not know the ZIP Code.

Q: Is that a volunteer position or paid position?

Page 18

A: He is paid.

Q: Does your campaign have any other or your committee have any other paid employees or paid consultants?

A: No, sir.

Q: Do you have an office in your district?

A: No, sir.

Q: Do you keep any record of people who work on your campaigns?

A: No, sir, I do not.

Q: During your last campaign — which was in 2002; is that correct?

A: Yes, sir.

Q: — did you have any campaign staff?

A: No, sir.

Q: Did you have a volunteer campaign staff?

A: I had people who would help me if there was a particular event that we were trying to put together.

Q: Who are those people?

A: Mr. Bender has helped in the past. A woman by the name of Rita Dixon from Mattapan has helped in the past. A woman by the name of Joan Corey, spelled C-o-r-e-y, has helped. And they tend to

Page 19

reach out, call other people, friends, neighbors.

Q: What is Joan Corey's racial or ethnic background?

A: It would be a guess. She is not a minority.

Q: And Ms. Dixon?

A: African American.

Q: Any other individuals who have helped with your campaign other than those three people?

A: There would be hundreds of volunteers and neighbors.

Q: But these are the core staff or the core volunteers, those three individual?

A: They do a lot of work during campaign time.

Q: All on a volunteer basis?

A: Yes, sir.

Q: What information do you have about your — or strike that question. Does either your office at the State House or your campaign committee receive information about the district from which you are elected about the demographics of the district or the voter turnout in the district or any information of that sort?

A: No, sir.

Page 20

Q: Do you get the Secretary of State's Massachusetts elections statistics?

A: They are available to me.

Q: Have you ever reviewed them?

A: I haven't looked — if you are referencing the document that I am carrying in my mind, it is called PD-43. I probably haven't looked at a PD-43 since the early '80s.

Q: Can you describe what you mean by "a PD-43."

A: It is, as I understand it, a breakdown of all the election returns across the entire Commonwealth.

Q: Do you know whether anybody on your staff has looked at a PD-43?

A: I do not know.

Q: After an election, do you ever analyze the results of that election?

A: I have, yes, sir. I have.

Q: How do you do that?

A: I look at the vote totals that would come in from each precinct.

Q: And do you look at the number of votes that were cast for you?

**Thomas M. Finneran**
**Vol. 1, March 28, 2003**

Page 45

issues raised by others. I don't know.

Q: Were there issues raised with respect to racial or ethnic discrimination with respect to the Boston Police Department?

MR. PERLMUTTER: You are talking about the lawsuits? Issues raised by whom, in what form, when? I object to the question.

Q: When you referred to hiring practices of the Boston Police Department, what were you referring to?

A: Newspaper reports of court cases that were being brought to change or challenge the hiring practices of the Boston Police Department.

Q: Were at least some of those cases, to the best of your knowledge, cases that were brought because of racial discrimination in the hiring practices of the Boston Police Department?

MR. PERLMUTTER: Objection.

A: According to the news reports, they were.

Q: Do you have any knowledge beyond the news reports?

A: No, sir.

Q: With respect to the Boston Fire Department, what was your basis of saying there was

Page 46

discrimination in hiring practices with respect to the Boston Fire Department?

A: The source of my information would be the newspaper stories.

Q: Did those hiring practices involve racial discrimination, to the best of your knowledge?

A: According to the newspaper stories, yes, sir.

Q: With respect to housing discrimination, did housing discrimination with respect to the Boston Housing Authority involve racial discrimination?

A: According to the newspaper stories, yes, sir.

Q: Do you have any other knowledge?

A: No, sir.

Q: In terms of private discrimination, — strike that. Do you believe that — first of all, when were the cases that you had knowledge of with respect to the Boston Police Department?

MR. PERLMUTTER: Objection. It is a matter of public record, written decisions.

Q: Do you know?

A: I don't know.

Q: Boston Fire Department?

Page 47

A: I do not know.

Q: Boston Housing Authority?

A: I do not know.

Q: Do you believe that public sector discrimination still has effects on minorities in the City of Boston?

MR. PERLMUTTER: Objection. Are you asking him — he is not designated an expert witness in this case. You are asking for his sort of generalized lay sense of things? Is that what you are asking for?

Q: You can answer the question.

MR. BENKA: Yes.

MR. PERLMUTTER: If you can answer the question.

A: Restate the question, please.

Q: Do you believe that public sector discrimination, either past or present, still has effects on minorities in the City of Boston?

MR. PERLMUTTER: Objection.

A: No, I do not.

Q: Why do you say that?

A: My firsthand experience with neighbors, friends, people that I have hired.

Page 48

Q: Do you believe that discrimination in education in the Boston Public School System does not have any effect on individuals who were subject to that discrimination?

MR. PERLMUTTER: Objection.

A: Would you restate the question. I don't understand the question.

Q: You testified that there was discrimination in the Boston Public School System; is that correct?

A: Yes, sir.

Q: Do you believe that individuals who were subject to that discrimination do not suffer the effects of that discrimination at this time?

MR. PERLMUTTER: Objection.

A: I do not know.

Q: Do you believe that individuals who were subject to discrimination in the Boston Police or Boston Fire Department do not suffer the effects of that discrimination at this time?

MR. PERLMUTTER: Objection.

A: I do not know.

Q: Do you believe that individuals who were subject to discrimination with respect to housing at the Boston Housing Authority do not suffer the

Page 53

MR. PERLMUTTER: Objection.

A: Restate that question.

Q: Do you have any reason to believe that the effects of past discrimination have not been remedied?

MR. PERLMUTTER: Objection.

Q: Let me rephrase the question.

MR. PERLMUTTER: It's a tough question.

A: Twice. I apologize. I didn't get that one.

MR. PERLMUTTER: Neither did anyone else.

MR. BENKA: Neither did I.

Q: Insofar as those programs — those programs still exist, do they not?

MR. PERLMUTTER: What programs?

Q: We are talking about the minority business enterprise programs; is that correct?

MR. PERLMUTTER: Objection.

A: To the best of my recollection, they still exist.

Q: And is it your understanding that those programs can exist only if they are designed to remedy the effects of past discrimination?

MR. PERLMUTTER: Objection.

Page 54

MR. PERLMUTTER: Are you asking for a legal conclusion?

MR. BENKA: I am asking for his conclusion as a —

MR. PERLMUTTER: As a lay person?

MR. BENKA: — as a Speaker of the House which enacts this legislation.

MR. PERLMUTTER: Objection.

A: Rephrase that — restate that, please, not rephrase it.

Q: Do you have any understanding of what is necessary to have minority business enterprise programs?

A: I believe that there has to be a foundation established of previous discriminatory practice.

Q: Do you believe that the programs are justified today?

MR. PERLMUTTER: Objection.

A: I have no basis for concluding whether they are justified or not.

Q: Do you have any reason to challenge the conclusion that there are effects of past discrimination which justify those programs today?

MR. PERLMUTTER: Objection.

Page 55

A: I don't have the foundation or an expertise.

Q: Have you supported anybody's campaign in the last ten years other than your own?

A: Sure.

Q: Has your campaign given monies to any other politician's campaign within the last ten years?

A: Yes. I have made campaign donations from my campaign committee, yes, sir.

Q: Do you know to whom you have made those?

A: I have made campaign contributions to Shannon O'Brien, to House colleagues, a variety of candidates.

Q: Do you recall which House colleagues you have made contributions to?

A: Not specifically.

Q: What was the racial or ethnic composition of your district when you were first elected?

A: I do not know.

Q: What was the racial or ethnic composition of your district after the 1990 redistricting?

A: I do not know.

Q: What was the racial or ethnic composition of it after the 2001 redistricting?

Page 56

A: I do not know.

Q: When I said "the 1990 redistricting," I meant the redistricting as a result of the 1990 census. Did you understand that?

A: Yes, sir.

Q: Are you familiar with the precincts which have been removed from your district as a result of the redistricting of 2001?

A: In a general — from a neighborhood perspective as opposed to a precinct numbering perspective.

Q: Do you know where those precincts were, the ones that were removed?

A: I grew up in the neighborhood. I live in the neighborhood I represent.

Q: Ward 17, Precinct 7 was removed. Do you know that?

A: I didn't. I don't. I will accept your question. I mean, I will accept that as a statement. I don't know myself.

Q: How would you describe the neighborhoods which were removed as a result of redistricting?

MR. PERLMUTTER: Objection.

Q: Go ahead.

Page 65

A: I have a recollection, I believe, 1997 or 1998 at which I would have either filed or spoken on behalf of an amendment to provide an increase in the appropriation which had been recommended for a citizenship assistance program.

Q: Any other occasion?

A: Not that I recall.

Q: What is the citizenship assistance program?

A: It was a program, as I recall, that we put in place in the aftermath of a federal decision with regard to benefits for immigrants, as I recall. Our response to that federal decision was to begin this program which would assist and encourage people to become citizens as quickly as possible.

Q: So am I correct in understanding that a federal decision reduced benefits for noncitizen immigrants?

A: That is my recollection.

Q: And did the — did you propose that the Commonwealth replace those lost benefits?

A: No. My recollection is that we proposed the citizenship assistance program which, once an immigrant who had been denied benefits became a citizen, then he or she could avail themselves of

Page 66

benefits because of their new status.

Q: Was there any suggestion from any member of the House or any proposal that the Commonwealth replace or supplement the benefits for noncitizen immigrants which had been lost, where benefits had been lost as a result of the federal decision?

MR. PERLMUTTER: Objection.

A: I can't recall with any specificity whether such a proposal was made.

Q: But you did not make a proposal of that sort?

A: No, sir.

Q: Before the break we were talking about the composition of your district, and I believe my questions were directed at the areas that were added to your district as a result of redistricting in 2001. Let me ask you, do you know which areas were added to your district as a result of redistricting in 2001?

MR. PERLMUTTER: Objection. Asked and answered, but go ahead.

A: I do not know.

Q: Did you campaign in different areas as a result of the 2001 redistricting?

Page 67

A: My campaign was pretty much restricted to mailed correspondence.

Q: Do you mail correspondence to every home in your district?

A: I try to, although there are from time to time specific community issues that are relevant to a particular community. For example, a long running sider of the Babson Street Bridge would probably be of little or no interest to people in Dorchester, Lower Mills, but it would be of greater urgency to the people in Mattapan. So in a situation like that, I would make a mailing to the neighborhoods that I represent in Mattapan.

Q: In your 2002 campaign when — you run for reelection every two years; is that correct?

A: Yes.

Q: In 2002 did you do a mailing generally to your district or mailings to your district?

A: I have a recollection of at least one mailing.

Q: Did that mailing go to all households in your district?

A: I believe that it did.

Q: Who would have a record of that?

Page 68

A: Somewhere we would probably be able to bring it to you. My recollection is that it was in an oversized postcard with a handful of citizens offering some type of commentary which, believe it or not, was favorable to my candidacy.

Q: Did you do any other mailings?

A: Not that I recall.

Q: Do you recall whether you did mailings in the 2000 election?

A: I don't have any specific recollection.

Q: Would there be any records of the addresses to which these mailings were made?

MR. PERLMUTTER: 2000?

MR. BENKA: In 2000 or 2002.

A: We would have — Mr. Bender would have a constituent mailing database.

Q: Who makes the decision where to mail campaign literature?

A: I would generally make the decision usually with the assistance of somebody like Mr. Bender.

Q: Did you do mailings in 2000 — strike that. Do you recall doing any mailings other than mailings that are addressed to a specific issue which did not go to all households in your district?

Page 73

Q: What is your basis for concluding that?

A: Driving and walking and jogging through all the different neighborhoods, the Codman Square neighborhood as well as the Milton neighborhoods.

Q: So the Codman Square area is lower in socioeconomic status than the Milton area; is that correct?

A: I would say so.

Q: And the Codman Square area is higher in minority residents than the Milton area; is that correct?

A: I would agree with that.

Q: Have you during — and beyond those general statements, do you have any knowledge or information about the racial or ethnic nature or the socioeconomic level of the areas which were removed from your district or added to your district as a result of 2001 redistricting?

MR. PERLMUTTER: Objection.

A: Beyond the general observations, familiarity with the neighborhoods? Nothing specific in terms of knowledge or information.

*Q. Anything general in terms of knowledge or information. What I am trying to determine is

Page 74

whether I have exhausted your knowledge about the racial and ethnic characteristics of the areas removed from your district and the areas added to your district.

MR. PERLMUTTER: Objection. You asked a question before the break whether he knew the racial and ethnic composition of the areas removed from his district. And according to my notes, his answer was he did not. You just asked him questions about areas that were added to his district. You are repeating yourself.

MR. BENKA: He has provided some information about —

MR. PERLMUTTER: Areas added to his district. Before you asked him about areas removed from his district, and you asked him questions whether he knew the racial and ethnic makeup of areas removed from his district. And his answer, according to my notes, was he did not.

MR. BENKA: Could you read back the question, please.

*(Question read)

MR. PERLMUTTER: Objection.

MR. BENKA: Okay. Let me rephrase the

Page 75

question.

Q: Do you have any other knowledge or information beyond what you have testified to today about the racial characteristics of the precincts removed from your district as a result of the 2001 redistricting?

A: No, I do not.

Q: Do you have any other knowledge or information about the ethnic characteristics of the precincts removed from your district as a result of the 2001 redistricting?

A: No, I do not.

Q: Do you have any other knowledge or information about the racial characteristics of the precincts added to your district as a result of the 2001 redistricting?

A: No, I do not.

Q: Do you have any other knowledge or information about the racial or ethnic — strike that — about the ethnic characteristics of the precincts added to your district as a result of the 2001 redistricting?

A: No, I do not.

Q: Who got the precincts that were taken out

Page 76

of your district as a result of the 2001 redistricting?

A: I do not know.

Q: Have you ever worked with the Maptitude program?

A: No, sir, I have not.

Q: Do you know whether anybody in your office has ever worked with the Maptitude program?

A: I do not know.

Q: Do you know whether Mr. Stefanini was trained to use the Maptitude program in connection with the 2001 redistricting?

A: I do not know.

Q: Do you know whether Francis Shea was trained to use the Maptitude program in connection with the 2001 redistricting?

A: I do not know.

Q: Do you know whether either of those individuals did any work in connection with the 2001 redistricting?

A: I do not know.

Q: Did you instruct them to do any work in connection with the 2001 redistricting?

MR. PERLMUTTER: Objection, legislative

Page 105

private internal thoughts about redistricting legislation, I am going to object on the grounds of legislative privilege.

A: Maybe you should restate the question so I can figure out how it fits in with —

Q: Were you interested in what the Redistricting Committee's plan did to your district?

MR. PERLMUTTER: You can answer that "yes" or "no."

A: Yes.

Q: And did you, insofar as you were interested in that, determine in some way what the Redistricting Committee's plan did to your district?

A: No.

Q: Did you know, prior to the release of the Redistricting Committee's plan, what that plan did to your district?

MR. PERLMUTTER: Objection, legislative privilege.

Q: So is it your testimony that after the release of the Redistricting Committee's plan, you did not determine what changes were made to your district?

A: No, I don't testify to that.

Page 106

Q: Then I misunderstood your testimony.

A: Okay.

Q: After the Redistricting Committee's plan was released, did you determine what changes that plan made to your district?

MR. PERLMUTTER: You can answer that "yes" or "no."

A: Yes.

Q: How did you determine that?

MR. PERLMUTTER: To the extent you can answer that question by relying on public information, you can answer that question. To the extent the answer calls for private internal communications of any kind relating to the crafting of redistricting legislation, I am objecting on the grounds of legislative privilege.

A: I would have looked at it as a public document that had been released by the Redistricting Committee.

Q: Did you do that?

A: After it had been filed with the House Clerk, yes.

Q: Did you, after that document had been filed with the House Clerk, determine what that plan did

Page 107

to anybody else's district?

A: Not that I recall.

Q: Do you know whether your staff members or any of your staff members had been monitoring the redistricting process prior to the release of the Redistricting Committee's plan?

MR. PERLMUTTER: You can answer "yes" or "no."

A: I do not know.

Q: Which of your staff members would have been responsible for monitoring the redistricting process given their relative or respective assignments in your office?

MR. PERLMUTTER: Objection. He said he doesn't know if any of the staff did.

MR. BENKA: Let me rephrase it.

Q: Within whose responsibilities would monitoring the redistricting process fall?

MR. PERLMUTTER: Objection.

A: Possibly Mr. Shea's, possibly Mr. Stefanini's jurisdictions.

Q: Did you get any reports from Mr. Shea or Mr. Stefanini about the redistricting process prior to the release of the Redistricting Committee's

Page 108

plan?

MR. PERLMUTTER: Objection, legislative privilege.

Q: After the Redistricting Committee's plan was made public, how long was it before the final plan was passed by the House?

A: I do not know.

Q: Was it less than a month?

A: I do not know.

Q: You don't recall whether it was less than a month?

A: I really don't recall.

Q: Do you recall any requests for delay of that process or request for the opportunity for the public to have input into the redistricting of the House?

MR. PERLMUTTER: Testify to any public such requests.

A: Not that I recall.

Q: Do you recall whether any requests were made to you or to your office from members of the public with respect to providing input on redistricting?

A: Not that I can recall.

Page 113

Q: compared to votes you got?

A: I do not.

Q: 1978?

A: That was my first election. I think it would have been multiple candidates for that.

Q: Have you testified to all of the contested elections that you can recall?

A: I believe there may have been another contested election, but I don't know — there may have been more than one. I don't recall what election cycle it could have occurred.

Q: It just didn't make an impression on you that you recall today?

MR. PERLMUTTER: Objection.

Q: The question is, did any other election make an impression on you other than the ones you have testified to today?

MR. PERLMUTTER: Objection.

A: They all make an impression.

Q: Do you take an election seriously when it is not contested?

A: Yes, I do.

Q: And do you take an election seriously regardless of the seriousness of the challenge or

Page 114

the likelihood that the challenger might be elected?

A: Yes, I do.

Q: Other than the elections that you have testified to today just now that you recall being contested, are there any other that you recall there being a contest?

A: As I have testified, I think there was at least one and there may have been more than one. But I can't recall those elections with the specificity of the others.

Q: You can't recall who the candidate was or what the results were?

A: I am struggling with a name, and I don't want to speculate.

Q: Did you during the redistricting process get any minutes or notes of public hearings that were held in connection with redistricting?

A: Not that I can recall.

Q: Did you get any minutes or notes of any public meetings that were held in connection with redistricting?

A: Not that I can recall.

Q: Did you review any plans other than the plan that was made public by the Redistricting

Page 115

Q: Committee or the final plan?

MR. PERLMUTTER: Objection to the form. But also to the extent that the question is directed at plans that were private and internal to the House as part of the process of creating, crafting redistricting legislation, I object on the grounds of legislative privilege. If the question is asking whether you received any plans, public plans that were proposed by members of the public, not by the House, as part of the redistricting process, you can answer that part of the question.

A: As to the public aspect, not that I can recall.

MR. BENKA: And as to any private review of legislative alternatives or legislative plans, he has been instructed not to answer?

MR. BENKA: Yes.

Q: Do you know where your campaign contributions come from, from which individuals or which parts of the city or state or otherwise?

A: They come from all over the place.

Q: Do you know what percentage of your campaign contributions come from within your district?

Page 116

A: I do not.

Q: Have you ever reviewed that information?

A: I have not.

Q: Do you know whether any African Americans have contributed to your campaign?

A: Yes, I do know that they have.

Q: How do you know that?

A: By their attendance at different fundraising events that I have had.

Q: What is the maximum contribution that can be made?

A: Under present law?

Q: Yes.

A: $500 per individual per year.

Q: Do you know whether any African Americans have made the maximum contribution to your campaign?

A: I do not know.

Q: Do you know whether Hispanics have made the maximum contribution to your campaign?

A: I do not know.

Q: Do you know whether any Hispanics have contributed to your campaign?

A: Yes, they have.

Q: How do you know that?

## Page 125

traffic violations.

Q: In what context did you hear that?

A: Conversations with minority folks.

Q: Have you done anything with respect to racial profiling in terms of legislation or other actions?

A: The last term we passed a prohibition on profiling and mandate all the police departments in the Commonwealth to report specifically on the race of people that they stop and make inquiry of.

Q: What role did you take in that?

A: The ordinary legislative role as Speaker, as a bill comes out of committee, making sure that there is enough ordinary course of progress to the floor so that the members can consider it.

Q: Did you sponsor that bill?

A: No. I have a policy of not sponsoring legislation.

Q: Did you propose that legislation?

A: No, sir.

Q: So did you do anything with respect to that legislation different than you would do with respect to any other legislation?

A: No. I treated that legislation as I would

## Page 126

treat all legislation.

Q: Have any of your constituents ever complained to you about redlining with respect to mortgage lending or house sales?

A: Yes, they have.

Q: And in what context did that occur?

A: Many years ago. It would be in the late '70s and early '80s that that topic would have been brought to my attention, and it was a topic that I became familiar with.

Q: Did you sponsor any legislation with regard to redlining?

A: I believe that I did, but I can't say with specificity.

Q: Do you recall now?

A: I can't recall specifically, but it was an issue that I tried to keep close attention on when I was on the Banking Committee.

Q: Have any of your constituents ever complained to you about problems with predatory lending?

A: Yes, they have.

Q: In what context has that occurred?

A: One of my town meetings in Mattapan.

## Page 127

Q: Recently?

A: Within the past, I would say, four years.

Q: Have you done anything with respect to that?

A: We have pursued legislation and encouraged the Banking Commissioner to adopt regulations which would establish limits on predatory lending.

Q: Have you personally done anything with respect to that legislation or those regulations?

A: I would have encouraged the chairman and members of the Committee on Banking to try to be active and vigilant on that subject.

Q: Do you recall actually encouraging the chairman and the members of the committee?

A: I don't recall the specific encouragement.

Q: Do you recall any specific action you took with respect to predatory lending other than —

A: I would have directed members of my office to engage the Banking Commissioner's office.

Q: Do you remember doing that?

A: I recall having conversations with office staff about it. I don't know who I would have directed specifically to follow up on that.

Q: Do you know if anything happened? Did you

## Page 128

follow up on that?

A: I believe the Banking Commissioner has established regulations to, as I satisfied earlier, limit that form of activity.

Q: Do you know specifically whether your staff did anything with respect to predatory lending?

A: I don't know specifically.

Q: Who on your staff would have dealt with contact from the public with respect to redistricting?

A: Literally it could have been any of them, any of the constituent staff or policy staff.

Q: If any records existed of contacts from the public, where would those be?

A: I do not know.

Q: Does your staff retain records of contacts from the public either in the form of letters or telephone calls?

A: I do not know how they maintain records.

Q: Would any request from the public with respect to redistricting be brought to your attention?

A: Not necessarily.

Q: And you, I think, have testified earlier

Page 137

A: I have heard of the Mildred Avenue School, yes, sir.

Q: Do you know whether there was a dispute with regard to the location of the Mildred Avenue School?

A: I was told it was very controversial.

Q: Were you involved in that at all?

A: I was not.

Q: Did you take an any position on it?

A: I did not. I noticed that the mayor and his school board had made a decision and I was informed of the controversy.

Q: Did any members of the community ask you to take a position on the Mildred Avenue School location?

A: They may have spoken to Mr. Bender about that.

Q: Were you informed by Mr. Bender that people had spoken to him about it?

A: I have a recollection of receiving some information.

Q: What was the dispute with regard to the Mildred Avenue School location?

A: I don't recall specifically.

Page 138

Q: Is the Mildred Avenue School located in an area that is predominantly minority?

A: I do not know.

Q: Do you know whether the students at the Mildred Avenue School are predominantly minority students?

A: I do not know.

Q: Do you know whether there was opposition from parents of children in the Mildred Avenue School area to the location of the Mildred Avenue School?

A: I do not know.

Q: So is it your testimony that you know that there was a controversy about the location, but you know nothing more?

A: I don't know who specifically was making the complaints or bringing their concern to Mr. Bender. People who would be in attendance at a community meeting, those people could come from anywhere.

Q: Do you know what the concerns were about the location of the Mildred Avenue School?

A: I do not, sir.

Q: Did you consider taking a position on that

Page 139

issue?

MR. PERLMUTTER: Objection.

A: I would have considered taking a position on anything that is brought to my attention. There are some issues that I leave to the people who are responsible for making the decision. In that case, my recollection is that it is entirely a mayoral or municipal decision.

Q: I take it from that that you did not weigh in on the issue or did not have the office weigh in on the issue?

MR. PERLMUTTER: Objection.

A: I don't have any recollection of weighing in on that issue.

Q: Are you aware of any voting irregularities which have occurred within your district?

MR. PERLMUTTER: Objection.

A: No, I am not.

Q: Are you aware of any voting irregularities that have occurred in Boston?

MR. PERLMUTTER: Objection.

A: No, I am not.

Q: Are you aware of any instances where voters in Boston who should have been allowed to vote were

Page 140

not permitted to vote?

A: Not that I know of, no, sir.

Q: Is Ward 18 in your district?

A: Parts of Ward 18 are in my district.

Q: Are you familiar at all with the Ward 18 caucus in 2000 that caused controversy, the Democratic Party caucus in Ward 18 in the year 2000?

MR. PERLMUTTER: Objection.

A: I remember reading newspaper reports of a Democratic caucus.

Q: What do you remember reading?

A: There was a controversy about, as I recall, an opportunity for members of the Democratic Party gathering in caucus to choose ward committee members. It is not an election as at least I think the ordinary citizen would look at an election. It is neither a primary nor a final. It is an internal party situation.

Q: And what was the controversy that occurred?

A: I don't recall. I don't participate in the Ward 18 caucus. I never have.

Q: Are you familiar with any steps taken by the Democratic Party with regard to the Ward 18 caucus?

Magaly Camacho, et al., v.
William Francis Galvin

Thomas M. Finneran
Vol. 1, March 28, 2003

Page 145

objection. Did you have any standing instructions to Mr. Rasmussen about when he could talk to the press?

A: No.

Q: Did you have any standing limitations on when he could talk to the press?

A: No.

Q: During the 2002 election campaign, did you have fundraisers outside of your district?

A: Yes.

Q: Do you recall where those were held?

A: In a variety of places, all across the Commonwealth.

Q: Can you identify any of them as you sit here today?

A: Not specifically. There would be any number of them.

Q: You can recall none of them?

A: No, not with any specificity. There were, as I say, any number of them. I choose to do very limited fundraising in my district. It is a working class district, and I am very conscious of that.

MR. PERLMUTTER: The question was, do you remember any of the fundraisers you had outside your

Page 146

district?

A: The answer is no.

Q: Can you tell me what your role was in the redistricting process?

MR. PERLMUTTER: Objection, legislative privilege. To the extent there is anything public about it, you can testify about that.

Q: Was there any public role you had in the redistricting process?

A: The same role that applies to any legislation, any legislation whatsoever.

Q: Just being Speaker of the House?

A: Speaker of the House.

Q: As a piece of legislation comes through?

A: Yes.

Q: Is there legislation that you take a more active role on?

A: I find that the budget requires a particular level of vigilance.

Q: Anything else?

A: Nothing that springs to mind.

Q: Do you know how Larry DiCara got hired with respect to the redistricting process?

A: Yes, I do.

Page 147

Q: How did that happen?

A: I would have made inquiry of his interest. I have known Larry DiCara for more than 40 years and I went to high school with Larry DiCara. He was the president of my class. He has a splendid reputation as having been an elected public official and as an attorney and as an attorney with a particular grasp of redistricting issues and the legal issues which spring from any redistricting proposal.

Q: So did you recommend him or did you hire him?

A: It would have been my decision to hire him, yes, sir.

Q: Had Mr. DiCara worked on any other redistricting plan prior to the House redistricting?

A: I recall that he was involved in a previous one. I do not know in what capacity.

Q: You testified that he had experience with redistricting, and I was just wondering whether there was some specific process that he was involved with that you can recall as you sit here today.

A: I have a recollection that he was involved in, I think, a federal redistricting case, perhaps in front of Judge Harrington, but I'm not sure.

Page 148

Q: How was information about the redistricting process made available to the members of the House?

MR. PERLMUTTER: To the members of the House? I am going to object on legislative privilege to the extent this relates to internal private communications relating to the redistricting process and the creation of redistricting legislation.

A: I will rely on counsel's assertion.

Q: So you are relying on legislative privilege?

A: Yes, sir.

Q: How was input given by — strike that. Who drafted the redistricting plans that were considered as alternatives?

MR. PERLMUTTER: Objection. Legislative privilege.

Q: What was the process for House members providing input on legislative — on alternative plans for redistricting?

MR. PERLMUTTER: Objection, legislative privilege.

Q: Do you know whether drafts of redistricting plans or alternative redistricting plans were

Thomas M. Finneran
Vol. 1, March 28, 2003

Magaly Camacho, et al.  v.
William Francis Galvin

Page 165

MS. WRIGHT: Today, yes.

MR. PERLMUTTER: Objection.

A: I would describe it as a mixed population changing from old Irish-Catholic dominance to a mixed population, more mixed population.

Q: Would it be your understanding that the population of Charlestown today is still majority white?

A: I think it would be.

Q: Have you ever discussed with anyone the possibility of placing Charlestown and Chelsea into separate legislative districts?

MR. PERLMUTTER: To the extent any of those communications occurred as part of the legislative process leading to the crafting, creation of redistricting legislation, I object on the grounds of legislative privilege.

A: I will rely on counsel's assertion of the legislative immunity privilege.

Q: Well, have you ever discussed that topic with someone other than a member of the legislature or their staffs?

MR. PERLMUTTER: Again, same objection. If it was done as part of the process of crafting and

Page 166

creating redistricting legislation, I will object on the grounds of legislative privilege.

A: I will rely on counsel's objection.

MS. WRIGHT: Are you instructing Speaker Finneran not to testify about any conversations with anyone regardless of their status as a member of the legislature or their staffs?

MR. PERLMUTTER: If they were done — any conversations that were part of the process of creating and crafting redistricting legislation is covered by the legislative privilege.

MR. BENKA: I apologize for interjecting, but even with third persons?

MR. PERLMUTTER: If it was part of the legislative process, yes.

MR. BENKA: I just wanted to understand what your position was.

MR. PERLMUTTER: I understand.

Q: Have you ever discussed with anyone the possibility of placing Charlestown and Chelsea in different House districts other than in connection with possibility of redistricting?

MR. PERLMUTTER: Outside of redistricting.

A: Not that I can recall.

Page 167

Q: In your view, what do Charlestown and Chelsea have in common that warrants them being placed in a district together?

MR. PERLMUTTER: Objection, legislative privilege.

Q: In your view, what, if anything, do Charlestown and Chelsea have in common?

MR. PERLMUTTER: Objection.

MS. WRIGHT: I take it you are not instructing the witness not to answer.

MR. PERLMUTTER: The question, as I heard it, doesn't go to the creation of legislation. It is a general question —

MS. WRIGHT: It is a general question.

MR. PERLMUTTER: — about what his view is on what they have in common, and I am objecting to the question. I haven't objected on legislative privilege grounds.

A: I think some of the things that they would share would be that they are each an urban constituency. So they would share classic urban concerns, concerns revolving around the quality of education, healthcare opportunities, public safety issues, housing issues and opportunities, and human

Page 168

service programs and supports. Obviously I think those would be shared in any urban district.

*Q. What differences, if any, do you see between the interests of Charlestown and Chelsea?

MR. PERLMUTTER: Objection. Again to the extent you are not to answer — your answer isn't to include anything that relates to the legislative process or of creating redistricting legislation or any other legislation.

THE WITNESS: Could you just read the question back.

*(Question read)

A: Chelsea would probably have a more heightened interest in bilingual education, for example, as an example.

Q: Are there any other differences that come to mind?

A: None that spring to mind.

Q: Based on your knowledge and experience, as between Charlestown and Chelsea, which area has a higher socioeconomic status in general?

MR. PERLMUTTER: Objection.

A: I do not know.

Q: What interests would you identify that